United States District Court
Southern District of Texas

**ENTERED**

December 20, 2016

David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| MUSKET CORPORATION, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-15-100 |
| | § | |
| SUNCOR ENERGY (U.S.A.) MARKETING, INC., | § | |
| | § | |
| *Defendant*. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the court are (1) a motion to exclude Edwin Arthur Smith filed by defendant Suncor Energy (U.S.A.) Marketing, Inc. ("Suncor") (Dkt. 75); (2) a motion to strike David J. Hackett filed by plaintiff Musket Corporation ("Musket") (Dkt. 76); and (3) a motion to exclude Jon P. Fjeld-Hansen filed by Suncor (Dkt. 77).  After considering the motions, related filings, and applicable law, the court is of the opinion that the motion to exclude Smith should be GRANTED IN PART, the motion to strike Hackett's testimony should be GRANTED IN PART, and the motion to exclude Fjeld-Hansen should be GRANTED IN PART.

## I. BACKGROUND

This is a breach of contract case.  Musket is a commodity supply, trading, and logistics company, and Suncor is a crude oil supply, marketing, and trading company.  Dkt. 25.  Musket and Suncor entered into a Master Agreement for U.S. Crude Oil Purchase, Sale, or Exchange Transactions and a Physical Confirmation Transaction (collectively, the "Agreement").  *Id.*  Musket claims Suncor did not deliver the crude oil as required under the Agreement, and Suncor claims Musket's claims are barred due to the occurrence of an "Interruption" as defined by the Agreement.  *Id.*; Dkt. 37.  There are currently competing motions for summary judgment and partial summary judgment pending before the court.  In addition, there are three remaining motions to exclude expert

testimony: Musket has moved to exclude the testimony of Hackett, and Suncor has moved to exclude the testimony of Smith and Fjeld-Hansen.  This order addresses only these three motions to exclude.

## II. LEGAL STANDARD

The Supreme Court of the United States acknowledged in *Daubert v. Merrell Dow Pharmaceuticals* that Federal Rule of Evidence 702 is the proper standard for determining the admissibility of expert testimony.  *Daubert v. Merrell Dow Pharms*., 509 U.S. 579, 597–98, 113 S. Ct. 2786 (1993).  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Under *Daubert*, a trial court acts as a "gatekeeper," making a "preliminary assessment of whether the reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93; *see also Kumho Tire v. Carmichael*, 526 U.S. 137, 147, 119 S. Ct. 1167 (1999); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243–44 (5th Cir. 2002).  *Daubert* and its principles apply to both scientific and non-scientific expert testimony.  *Kumho Tire*, 526 U.S. at 147. Experts need not be highly qualified to testify, and differences in expertise go to the weight of the testimony, rather than admissibility.  *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009). Nonetheless, courts need not admit testimony that is based purely on the *ipse dixit* of the expert. *Gen. Elec. Co. v. Joinder*, 522 U.S. 136, 146, 118 S. Ct. 512 (1997); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

In addition to being qualified, an expert's methodology for developing the basis of his or her opinion must be reliable. *Daubert*, 509 U.S. at 592–93; *Moore*, 151 F.3d at 276. "The expert's assurances that he [or she] has utilized generally accepted scientific methodology is insufficient." *Moore*, 151 F.3d at 276. Even if the expert is qualified and the basis of his or her opinion is reliable, the underlying methodology must have also been correctly applied to the case's particular facts in order for the expert's testimony to be relevant. *Daubert*, 509 U.S. at 593; *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). The party proffering expert testimony has the burden of establishing by a preponderance of the evidence that the challenged expert testimony is admissible. *See* Fed. R. Evid. 104(a); *Moore*, 151 F.3d at 276. The proponent does not have to demonstrate that the testimony is correct, only that the expert is qualified and that the testimony is relevant and reliable. *Moore*, 151 F.3d at 276.

### III. ANALYSIS

#### A. Smith

Musket's counsel retained Smith to provide a report and testimony on the value chain and logistics of the North American crude oil market from wellhead to refinery, the actions and capabilities of the parties during the term of the Agreement, and the parties' damages or alleged damages. Dkt. 75, Ex. B (Smith's Rep.). Smith has over forty years of commodity market experience. *Id.* He trained as an agricultural economist and worked in the energy futures market from 1979 through 1991. *Id.* He notes that crude oil futures opened for trading in late 1983 and that he was one of the first to trade this market. *Id.* In the 1990s, he developed a grain merchandising business in Central Texas. *Id.* From 2001 through 2004, he was on the faculty at Texas A&M University, where he developed the curriculum in Energy Risk Management for the Reliant Energy Trading Center. *Id.* Smith joined the Finance Department at the Bauer School of Business at the

University of Houston in 2006 and currently teaches Energy Trading and Energy Market Analysis classes. *Id.* He also works as a consultant. *Id.* In 2009, Smith became the Chief Economist and Director of New Products at CIMA Energy Inc. *Id.* In this role, he positioned CIMA in the crude-by-rail business, developed a crude terminal, and managed terminal operations. *Id.*

Suncor moves to exclude Smith's expert testimony, arguing that Smith has no specialized knowledge in the interpretation of the Agreement and that his testimony about the Agreement will not help the trier of fact. Dkt. 75 at 1. Suncor asserts that Smith inappropriately draws legal conclusions about the Agreement, testifies about damages barred by the Agreement, and opines as to the ultimate legal question in the case. *Id.* Suncor also contends that the opinions Smith offered during his deposition that were not in his expert report are untimely. *Id.*

Musket contends that Smith's education, training, and experience qualify him to testify about the crude-by-rail industry, the Agreement, and related issues. Dkt. 87 at 6. Musket asserts that Smith does not offer any legal opinions and that his testimony is instead about industry standards and practices relating to the Agreement, which it argues are appropriate topics for an expert. *Id.* at 11. Musket additionally contends that Smith's testimony is helpful to the jury and that all of the opinions offered at Smith's deposition are timely because Smith merely expanded on the opinions in his report during his deposition. *Id.* at 20–22.

In reply, Suncor reiterates its original arguments and asserts that Musket misconstrues Smith's deposition testimony. Dkt. 91. Suncor argues that Smith is an economist, not a lawyer, and that Smith's only experience with contracts is sitting in on meetings while his coworkers negotiated two dissimilar take-or-pay agreements. *Id.* at 2. Suncor also argues that Smith's opinions are not merely an expansion of the topics in Smith's report. *Id.*

### 1.    Qualifications

First, Suncor asserts that Smith is unqualified to testify about the meaning, interpretation, or parties' obligations under the Agreement.  Dkt. 75 at 2.  Under Federal Rule of Evidence 702, an expert must be qualified by his or her "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  The district courts "should refuse to allow an expert to testify if it finds that the expert is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999).  Suncor argues that Smith is unqualified to testify about the meaning, interpretation, and parties' obligations under the Agreement because (1) he has no specialized experience interpreting contracts; (2) he has no experience as an expert testifying on the meaning, interpretation, or parties' obligations under a contract; and (3) he admits that he does not understand the meaning of the damages prohibited in the Agreement.  Dkt. 75 at 4.  Suncor particularly takes issue with Smith's testimony about damages because Smith admitted during his deposition that he was not sure what some types of damages are.  *Id.* at 5–6 (citing Dkt. 75, Ex. C at 326, 331).

Musket argues that it is "well-settled that expert testimony concerning industry practices and standards, as it relates to contract interpretation, is permissible."  Dkt. 87 at 6.  Musket touts Smith's experience in the crude-by-rail industry and his experience with, specifically, commodity supply agreements.  *Id.* at 7–8.  During his deposition, Smith testified that he has "'reviewed a lot of different contracts,'" including "take-or-pay contracts for storage." *Id.* at 8 (quoting Dkt. 87, Ex. B at 46).  Musket asserts that Smith has experience in contract-interpretation issues based on his specialized, relevant trade experience and training in the discrete area of the industry before the court in this case.  *Id.* at 9.  As far as damages, Musket notes that Smith is not offering legal opinions, he is testifying about industry practices.  *Id.* at 10.  Thus, his lack of knowledge about terms relating to damages is inconsequential.  *Id.*  Musket asserts that Smith does not offer any opinions about

ultimate legal issues in the case and instead provides the factfinder with useful information on customs and practice of the industry. *Id.* at 11–12. Finally, Musket argues that any lack of specialization would go to the weight of the testimony, not its admissibility. *Id.* at 11.

The court notes first that while it is the court's province to determine the legal meaning of a contract, the court may rely on an expert experienced in a specific field to obtain explanations of "the technical meaning of terms used in the industry." *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 611 (5th Cir. 2000). The court has reviewed the contested testimony and finds that Smith draws many legal conclusions. The motion to exclude Smith's testimony based on his qualifications is GRANTED IN PART. The court will not consider any of Smith's testimony to the extent he draws legal conclusions about the meaning of the Agreement, but it will rely on Smith's testimony to the extent he provides insight into the technical meaning of terms as used in the industry.[1]

## 2. Timeliness

Suncor argues that the court should strike Smith's testimony as untimely because (1) Smith's testimony during his deposition that Suncor had a "rogue trader" was not discussed in his report; and (2) Smith provided undisclosed rebuttal testimony for the first time at his deposition. Dkt. 75 at 11–12. Under Federal Rule of Civil Procedure 26(a)(2), expert reports must contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B). However, the rule also allows parties to "supplement these disclosures when required under Rule 26(e)." Fed. R. Civ. P. 26(a)(2)(E). Rule 26(e) requires parties to supplement disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise

---

[1] If after the summary judgment stage there are still issues with Smith's testimony at trial, the court will rule on specific objections at that time.

been made known to the other parties during the discovery process or in writing."  Fed. R. Civ. P.

26(e)(1)(A).  With regard to expert reports, specifically, Rule 26(e) states that the "party's duty to

supplement extends both to information included in the report and to information given during the

expert's deposition.  Any additions or changes to this information must be disclosed by the time the

party's pretrial disclosures under Rule 26(a)(3) are due."  Fed. R. Civ. P. 26(e)(2).  The pretrial

disclosures under Rule 26(a)(3) are due, unless otherwise ordered by the court, thirty days before

trial.[2]  Fed. R. Civ. P. 26(a)(3)(B).  The Advisory Committee Notes to the 1993 amendment to Rule

26 indicate that paragraph (a)(2), which is the paragraph requiring a report, "impose[s] an additional

duty to disclose information regarding expert testimony sufficiently in advance of trial that opposing

parties have a reasonable opportunity to prepare for effective cross examination and perhaps arrange

for expert testimony from other witnesses."  Fed. R. Civ. P. 26, notes (1993 amend.).

Suncor moves to strike Smith's testimony either because he did not include certain

information in his expert report under Rule 26 or because it is rebuttal testimony that was not

disclosed within thirty days of Suncor's expert disclosure.  Dkt. 75 at 10–11.  The court will not

address the rebuttal testimony argument because Suncor did not specify which testimony it contends

is rebuttal.  *See id.* at 12 (discussing generally how Smith "provided rebuttal testimony at his

deposition for the ***first time***" even though the deposition was two months after Suncor's expert

report, but failing to identify the offending testimony).  The court has no way to determine what

portion of testimony Suncor alleges is rebuttal testimony.[3]

---

[2] Generally, the court sets the pretrial disclosures deadline in a scheduling order.  However, in this case the court has cancelled all deadlines pending rulings on all of the evidentiary motions and motions for summary judgment or partial summary judgment currently on file.  *See* Dkt. (Aug. 17, 2016).  The trial date will be reset after the court rules on the pending motions.

[3] Suncor makes the same rebuttal testimony argument with regard to Fjeld-Hansen.  *See* § C, *infra*.

As far as the alleged new testimony about a rogue trader, Musket asserts that Smith's opinions regarding the "rogue trader" at his deposition are in his report.  Dkt. 87 at 22.  Smith explained during his deposition that he believed a certain individual was a rogue trader because this individual did not follow all of Suncor's risk policies.  *Id.* at 23 (citing Smith's deposition).

Musket argues that this is basically what Smith's report said.  *Id.*  Musket points out that the alleged rogue trader was Suncor's trader-in-charge and supervised the communications among the parties.  *Id.*  Musket contends this is encompassed in Smith's report because the report notes that Suncor entered into contracts it could not profitably fulfill.  *Id.* (citing Dkt. 87, Ex. A at 14, 17–18).  Musket asserts that the testimony about the trader being a "rogue trader" is merely an expansion on the testimony about how Suncor traded in general.  *Id.* at 24.  Additionally, Musket notes that Suncor had ample opportunity to depose Smith about this opinion, so there is no danger of unfair surprise in permitting Smith to expand upon his report.  *Id.*  In reply, Suncor argues that Musket's argument that the rogue trader testimony is merely an expansion of Smith's report is "unpersuasive." Dkt. 91.

The court agrees with Suncor that Musket's argument that the testimony is merely an expansion of the report is unpersuasive.  While at first glance Smith's testimony that he believes Suncor's trader in charge had gone rogue may just be an expansion of the expert testimony that Suncor was entering into contracts it could not fulfill, when one examines Smith's testimony about what a "rogue trader" is, this supposition fades.  Smith defined "rogue trader" during his deposition as "somebody that doesn't follow the policy guidelines, doesn't follow the risk policy of the corporation." *See* Dkt. 87, Ex. B at 383.  Yet Smith did not discuss Suncor's risk policy guidelines in his report, and he could not identify during his deposition how much money the alleged rogue trader had made or lost during his tenure with Suncor.  *See id.* at 384.  The court finds that, given Smith's own definition of "rogue trader," his testimony about a Suncor employee being a rogue

trader is outside of his expert report.  This testimony will not be permitted at trial, and the court will not consider Smith's opinion regarding the rogue trader when it addresses the parties' motions for summary judgment or partial summary judgment.  Accordingly, Suncor's motion to strike Smith's testimony is GRANTED with respect to the rogue trader issue, but DENIED with respect to the alleged rebuttal testimony.

**B.     Hackett**

Hackett is the president of Stillwater Associates LLC ("Stillwater"), a transportation energy consulting company.  Dkt. 76, Ex. A-1 (Dkt. 76-1).  He received a Bachelor of Science degree in Oceanography from the U.S. Naval Academy in 1971, and he earned an Masters of Business Administration degree from the University of California, Irvine, in 1997.  *Id.*  He worked for Mobil Oil Corporation ("Mobil") for twenty years and then founded Stillwater in 1998.  *Id.*  Stillwater consults "on topics like gasoline price controls, corn ethanol distribution, biodiesel production, next generation renewable fuels implementation, price gouging, fuels infrastructure constraints, refinery mergers and acquisitions, interstate commerce, Low Carbon Fuel Standard, Cap & Trade, Crude-by-Rail, and refining technology."  *Id.*  Hackett states that he reviewed documents relating to the Windsor Terminal and has determined, based on the documents and his experience in the industry, that the tank capacity and infrastructure at the Windsor Terminal was not sufficient; that the Agreement was a sales agreement and not the type of agreement that could have included a take-or-pay provision; and that Musket had alternatives to mitigate its damages and failed to do so.  *Id.*

Musket argues that (1) Hackett is not qualified to render opinions on the parties' obligations under the Agreement, Musket's Windsor Terminal operations, or any other crude by rail matters; (2) Hackett's opinions are unreliable and not helpful to the trier of fact; and (3) any opinions relating

to counterclaims offered by Hackett should be stricken because Suncor did not timely designate Hackett as an expert for its counterclaim.  Dkt. 76.

Suncor contends that Hackett is qualified to offer his opinions as he has extensive experience, knowledge, and training with a similar product and experience administering contracts like the Agreement.  Dkt. 83.  Suncor asserts that Hackett's opinions are reliable because they are based on sufficient facts and data and are derived from reliable principles and methods that are reliably applied to the facts.  *Id.*  With regard to opinions about counterclaims, Suncor argues that Hackett may offer these opinions because the parties agreed that the expert-designation dates applied by party, not by claimant, and Hackett was timely designated as an expert for Suncor as the defendant.  *Id.*  Moreover, Suncor contends that the opinions are timely under Rule 26 as rebuttal evidence even if they are otherwise untimely.  *Id.*

Musket replies that Hackett is indeed not qualified as he has no educational background on the most relevant issues and relies in part on his degree in Oceanography—even though he admitted that the relationship between crude-by-rail and oceanography is tenuous.  Dkt. 94.  Additionally, Musket contends that Hackett's alleged experience with similar contracts is negotiating two short-term crude deals and work on administering contracts for a different company many years ago; Musket argues that this experiences many is insufficient.  *Id.*  Musket points out that Hackett admitted during his deposition that he had never seen a contract like the Agreement.  *Id.* (citing Dkt. 76, Ex. A-2 at 73).

Musket argues that even if Hackett were qualified, his opinions are unreliable because he made assumptions that were either wrong or simply parroted from other colleagues.  *Id.*  Additionally, Musket points out that Hackett did not draft his second and third opinions.  *Id.* (citing Ex. A-2 at 183).  With regard to the counterclaim, Musket states that "Suncor missed its expert

designation deadline and is now grasping for an excuse." *Id.* Musket asserts that there was no understanding between the parties that the expert-designation deadlines were party-specific. *Id.* Musket argues that the testimony cannot qualify as rebuttal testimony because Hackett makes no reference to Musket's report on that topic. *Id.*

1.    **Qualifications.** Under Federal Rule of Evidence 702, an expert must be qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. However, experts do not have to be highly qualified, and differences in expertise bear on the weight of the testimony, not its admissibility. *Huss*, 571 F.3d at 452.

Musket admits that Hackett has experience in a variety of energy-related fields, but it contends that Hackett has no experience or "remarkably limited" experience with crude by rail. Dkt. 76. Musket specifically objects that this renders Hackett unqualified to testify about Musket's crude oil facility, the Agreement, or the parties' corresponding obligations under the Agreement. *Id.* Musket argues that Hackett's educational background is inapplicable to the crude-by-rail issues in this case, noting that Hackett testified that "'[i]t's kind of a stretch between oceanography and crude by rail.'" *Id.* (quoting Dkt. 76, Ex. A-2 at 86).

Suncor contends that Musket's argument goes to the weight to be assigned Hackett's testimony, not its admissibility. Dkt. 83. Suncor argues that an expert's skill or knowledge does not have to derive from the exact same experience so long as it is based on a similar pursuit. *Id.* Suncor notes that Hackett has over forty years of experience in the oil and gas industry working as a scheduler, analyst, supply coordinator and manager, and trading and distribution manager, and that Hackett has experience analyzing tank capacity. *Id.* (citing Dkt. 83, Ex. 4A at 23, 25, 26–30, 33, 36, 40, 43, 44–45, 54–55). Suncor also points out that Hackett has taken courses in economics and asset optimization and has knowledge about these topics from his jobs. *Id.* (citing Dkt. 83, Ex. 4A at 81,

85).  Suncor argues that Hackett's lack of specialization in the crude-by-rail industry does not render

his opinion inadmissible.  *Id.*  Suncor also asserts that Hackett has ample experience negotiating and

administering contracts and that it "makes no difference whether this experience was with contracts

involving crude oil, gasoline, or ethanol."  *Id.*  Suncor points out that Hackett has negotiated several

dozen contracts and has experience administering a contract that is "just like the [Agreement],

including administering the take-or-pay provisions."  *Id.* (citing Dkt. 83, Ex. 4A at 66–67, 71–72,

364).

 Hackett testified that he has never operated any crude-by-rail terminals, but that he did

negotiate "[p]robably several dozen" contracts when working for Mobil, including a few that related

to crude oil purchases, though most of them related to gasoline.  Dkt. 83, Ex. 4A at 66.  Hackett

admitted that he never negotiated a contract with a two-year term while at Mobil, but he did

administer contracts like that.  *Id.* at 71–72.  He also stated that he does not recall seeing a contract

"with the combination that's in this contract," and he has never negotiated a "take-or-pay" provision.

*Id.* at 73, 364.  Hackett admitted that he has no accomplishments or publications in his curriculum

vitae relating to directly to crude by rail or rail terminal operations.  *Id.* at 76–77.  He stated that it

is "a stretch" between his undergraduate degree in oceanography and the crude oil issues he is

testifying about in this case, but he noted that the study of the components that went with his

degree—math, engineering, and leadership—connect the two.  *Id.* at 87–88.  Hackett agreed,

however, that he has no technical training in "how a railcar, a tank car, in connection with moving

of crude by rail, work[]."  *Id.* at 89.  That being said, Hackett did testify that in his various roles he

has coordinated the movement of fuel oil between refineries; analyzed the economics of moving

crude oil; coordinated communications about market conditions and refinery operating plans; dealt

with ensuring his company's information technology would support rail terminals delivering

gasoline, diesel, and heating oil; supervised the coordination of the movement and supply of crude oil and ethanol; supervised all supply-chain processes; and analyzed tank capacity and inventory management.  Dkt. 83 at 7 (citing Dkt. 83, Ex. 4-A at 23–25, 26–30, 33, 36, 40, 43–44, 54–55).

After considering Hackett's report and testimony, the court agrees with Suncor that Musket's concerns about Hackett's qualifications go to the weight of his testimony, not its admissibility. Hackett's forty years of experience in the oil and gas industry working as a scheduler, analyst, supply coordinator and manager, and trading and distribution manager qualifies him to render the opinions he offers, to the extent they are non-legal opinions.  The fact that his experience is not directed at crude oil specifically may be considered by the trier of fact when deciding how much weight to give Hackett's testimony.

As to legal conclusions about the Agreement, "'[i]n the absence of specialized trade usage, expert testimony regarding proper contract interpretation is inadmissible, as is expert testimony regarding the legal significance of the contract language.'" *Fisher v. Halliburton*, No. 05-1731, 06-1791, 06-1168, 2009 WL 5216949, at *4 (S.D. Tex. Dec. 21, 2009) (Miller, J.).  Here, there is no indication that Hackett's opinions about the Agreement relate to specialized trade usage.  Thus, any opinions about the legal significance of the terms in the Agreement are inadmissible.  The motion to strike Hackett's testimony based on qualifications is thus GRANTED IN PART in that the court will not consider any legal conclusions reached by Hackett.

### 2.    Unreliable and Unhelpful

Musket contends that the reliability of Hackett's methods is "woefully deficient."  Dkt. 76. Rule 702 requires that all scientific, technical, or other specialized knowledge assist the trier of fact and be the product of reliable principles and methodologies, among other things. Fed. R. Evid. 702.

The underlying methodology must have also been correctly applied to the case's particular facts. *Daubert*, 509 U.S. at 593.

According to Musket, there is no basis for the assumptions Hackett was given and there is no basis for the assumptions he made. Dkt. 76. Musket contends that Hackett relied on his team's experience without any further supporting information or evidence and made assumptions that he now acknowledges were incorrect. *Id.* Thus, Musket argues that Hackett's opinions are not based on sufficient facts and data. *Id.*

(a) **Hackett's First Opinion.** Musket asserts that Hackett's first opinion—that the Windsor Terminal did not have enough tankage or infrastructure to reliably receive 20,000 barrels per day of crude oil—is merely a subjective belief because Hackett "did not even know whether a pipeline could deliver crude to Musket's Windsor terminal," and whether there is a pipeline that could deliver crude oil "would drastically alter the bases of all of Hackett's opinions relating to Windsor operations." *Id.* Musket notes that neither Hackett nor his team ever visited the Windsor Terminal and that Hackett did not even know, when asked at his deposition, the bases of his opinion that "'Windsor would require operable tank capacity of at least 130% of unit train capacity to routinely load 20kbd of crude oil.'" *Id.* (quoting Dkt. 76, Ex. A01 at 3–6). Instead, Hackett stated that he relied on his colleague, Ralph Grimer. *Id.* Musket additionally points out that Hackett was not aware that Musket was using rolling storage in connection with the Windsor Terminal when he wrote his report. *Id.* (citing Dkt. 76, Ex. A-2 at 203). Hackett also admitted in his deposition that "'the size of the trains at Windsor were different than the size that [he and his colleagues] assumed for the analysis.'" *Id.* (quoting Dkt. 76, Ex. A-2 at 163).

Suncor argues that Hackett's first opinion is based on his experience and the documents produced in this case. Dkt. 83. Suncor asserts that Hackett "did in fact evaluate the Windsor

14

Terminal." *Id.* at 10 (citing Dkt. 83, Ex. 4A (Dkt. 83-4) at 105:20–22 ("Oh, I reviewed articles about the Windsor terminal that I found online.")).   Additionally, Suncor notes that Hackett relied on communications from Musket's employees showing the Windsor Terminal's capacity constraints. *Id.* at 10–11.

The court finds that Hackett's first opinion is based on unreliable methodology.   Hackett admits that he did not visit the terminal and that he used incorrect information for his analysis. Moreover, he could not even testify as to the bases for his opinion.   The court is not persuaded by Suncor's assertion that Hackett "did in fact evaluate the Windsor Terminal," as this evaluation was, according to the citation provided by Suncor, done by reviewing unknown articles found on unknown websites, which certainly does not meet the *Daubert* standard for reliably investigating the capacity to take crude oil.[4]   Suncor has not met its burden of showing this opinion meets the *Daubert* standard.   As far as the opinions based on Suncor communications, Hackett's testimony is not needed or helpful as Suncor may present these communications through non-expert witnesses. Musket's motion to exclude Hackett's testimony as to his first opinion is GRANTED.

**(b) Hackett's Second and Third Opinions.**   Next, Musket contends that Hackett's second opinion, which is about Suncor's interruption claim, and his third opinion, which is about the Agreement, are based on unreliable foundations because the opinions are really those of Hackett's colleague, Michael Bloch, and not of Hackett.   Dkt. 76 at 19–20.   Hackett believes Bloch came to his conclusions simply by reading the Agreement; Hackett did not know if Bloch relied on any documents when formulating this opinion.   *Id.* at 20 (citing Dkt. 76, Ex. A-2 at 190).   Hackett relied

---

[4]   While it is possible to reliably investigate on the Internet, as is evidenced by the use of Westlaw Next or LexisNexis to investigate the law, the court cannot determine that Hackett based his opinion on reliable information when the only information it has is that he reviewed some articles he found online.

on testimony from Suncor and on reading the Agreement as the bases for his opinion regarding the interruption.  Dkt. 76 at 20 (citing Dkt. 76, Ex. A-2 at 190–91, 322).  He also relied on a report on the Internet from a government agency.  *Id.* at 21 (citing Dkt. 76, Ex. A-2 at 324–26); *see* Dkt. 76, Ex. A-2 at 327 (identifying where he found the report).  When asked, Hackett could not identify the pipeline that experienced the alleged issue or its location and relied solely on Suncor's testimony. Moreover, Hackett admitted that he had "no other basis to support [his] testimony" about the length of the interruption "other than the delivery data that Suncor provided . . . reflecting what it delivered to the Musket terminal."  *Id.* (citing Dkt. 76, Ex. A-2 at 342).  He based his opinion that there was an interruption on the volumes Suncor delivered.  *Id.*  He also stated during his deposition that he was "'*assuming* that [Suncor's] inability to secure crude was a result of a rupture in a pipeline'" in July of 2014.  *Id.* (citing Dkt. 76, Ex. A-2 at 347) (emphasis added).  He also admitted that Suncor's failure to deliver enough crude oil could have been something "totally unrelated to any rupture in the pipeline."  *Id.* (citing Dkt. 76, Ex. A-2 at 347).

Suncor contends that Hackett may testify about the parties' obligations under the Agreement because he testified that he has "administered plenty" of contracts involving crude oil including one like the Agreement at issue.  Dkt. 83 at 11 (citing Dkt. 83, Ex. 4-A at 71–72).  Suncor asserts that Hackett may opine on the Agreement to explain the parties' obligations based on the similar contracts he has administered.  *Id.*  With regard to Hackett's opinion regarding the interruption, Suncor argues that Hackett's conclusions are reliable because they are based on communications involving Suncor employees, Musket employees, producers, suppliers, as well as public information about a pipeline explosion.  *Id.* at 12 (citing Dkt. 83, Ex. 4-C (Hackett Rep.) at 8).

Hackett's second opinion is that a "pipeline rupture resulted in a [force majeure] event or Interruption under the Contract.  Suncor notified Musket about the pipeline rupture—along with

16

other production and regulatory issues—and the impact on Suncor's ability to obtain crude oil producers in the area. These [force majeure] events or Interruptions continued through October 2014." Dkt. 83, Ex. 4-C at 8. While the court is not concerned about Hackett basing his opinions about the pipeline rupture on Suncor's communications,[5] it is concerned that Hackett admits he does not know if the rupture caused the interruptions to continue through October 2014 and that he based this on an assumption. That aspect of his opinion is not reliable. The motion to strike Hackett's second opinion as unreliable is therefore GRANTED IN PART, and the court will not consider Hackett's opinion with regard to how long the rupture caused an interruption.

Hackett's third opinion includes an opinion that if Musket were harmed by Suncor, it had a duty to mitigate under the Agreement and that "[u]nder the agreement, Musket, the Buyer, should go into the market to buy alternative supplies when Suncor could not deliver." Dkt. 83, Ex. 4-C at 9. He then discusses the ways in which Suncor could have mitigated damages. *Id.* Hackett also discusses the exclusivity provision and the exclusions and limitations and how these provisions should be interpreted and applied. *Id.* Hackett opines that Musket could have obtained supplies with other shippers to use its available capacity and could have pursued at least eight of Suncor's competitors to buy from. Dkt. 83, Ex. 4-C at 10.

The court does not believe that Hackett's third opinion is unreliable simply because he bases his conclusions on his experience administering similar contracts and also relies on a colleague. Any issues with these methods go to the weight of the testimony, not its admissibility. The motion to exclude Hackett's third opinion as unreliable is thus DENIED. However, the court here reiterates that Hackett may not offer the aforementioned testimony that relates to the actual interpretation of the contract; this is the court's province.

---

[5] Hackett also confirmed this with government records. *See* Dkt. 83, Ex. 4-A at 327.

### 3.       Opinions Regarding Suncor's Counterclaim

Musket next argues that the court should strike Hackett's opinions regarding Suncor's counterclaims because Suncor failed to properly designate Hackett as an expert on its counterclaim. Dkt. 76 at 22. Suncor's counterclaim is a breach of contract claim. Dkt. 12. Suncor alleges that Musket breached the Agreement by failing to comply with the terms and failing to purchase or receive the agreed-upon crude oil volumes. Dkt. 76 at 22. Musket requests that the court strike, specifically, the following paragraph found on page 8 of Hackett's report because Suncor did not designate or did not timely designate Hackett to testify about the counterclaim:

> "In addition, according to Additional Provisions, Windsor Terminal (ii) in the PTC, 'If Buyer is unable to provide railcars over three consecutive months which interferes with Seller's ability to ratably deliver Product to the Windsor Terminal, Buyer to pay Seller $1.50/barrel. [sic.] for each barrel that Seller delivers to an alternate terminal.' The above clause operates to not only reduce any ToP volume (assuming the ToP conditions were met), but provides for damages payable to Suncor."

*Id.* (quoting Dkt. 76, Ex. A-1 at 8). Musket argues that the court ordered that all written reports filed by counter-plaintiff were due by April 5, 2016. *Id.* at 23 (citing Dkt. 56). Musket states that Suncor designated Hackett on May 3, 2016, which is the date *defendants* and *counter-defendants* were required to designate experts. *Id.* Musket argues that under Rule 26(a), Suncor should not be permitted to use evidence from the untimely designated expert at trial and under Rule 37 the court may exclude the witness as a sanction for the Rule 26 violation. *Id.* at 24. Moreover, Musket contends that the court should not permit the untimely designation because Suncor's failure to comply with the order to file reports by April 6 (1) prevented Musket from preparing a counter-defendant designation responding to Hackett's opinion on counterclaim damages; and (2) prevented Musket from preparing for Hackett's deposition with regard to the counterclaim. Musket argues that

a continuance would be prejudicial because docket call was (at the time Musket wrote its motion) scheduled for September 2016. *Id.* at 25.

Suncor responds that the "parties operated with the understanding that the expert-designation deadlines were party specific and not based on claimant versus counter-claimant." Dkt. 83 at 17. Suncor additionally argues that even if the court were to find the designation untimely, Hackett's opinions are still timely as rebuttal evidence to Suncor's expert Edwin Arthur Smith as they were disclosed within thirty days of Smith's report. *Id.* at 18 (relying on Fed. R. Civ. P. 26(a)(2)(D)(ii) and *Global Integrated Bldg. Sys. v. Target Logistics, LLC*, No. H-06-2637, 2008 WL 5552332 (S.D. Tex. May 19, 2008)). Moreover, according to Suncor, Musket has not been prejudiced by the allegedly late disclosure. *Id.* at 19. Suncor points out that Musket received the report two months before the close of discovery and before all but one of the fact witnesses' depositions were taken. *Id.* Additionally, Musket questioned Hackett on issues relating to the counterclaim during Hackett's deposition. *Id.* (citing Dkt. 83, Ex. 4-A at 241–44, 351, 367–73).

Musket replies that Suncor is the only party that operated with the understanding that the deadlines were party specific and not based on claimant versus counter-claimant. Dkt. 94 at 5. As far as the argument that it is rebuttal testimony, Musket points out that the report does not even mention Musket's expert's report and asserts that Suncor has not met its burden of showing that the testimony is rebuttal testimony. *Id.*

First, the court is not convinced that there was an actual "understanding" between the parties that the expert deadlines were party specific and did not relate to the types of claims. The court's scheduling order clearly states, in bold capital letters, that the April 5 deadline is for "**EXPERT WITNESSES FOR PLAINTIFF/*COUNTER-PLAINTIFF*.**" Dkt. 56 (emphasis added). While emails between Musket and Suncor about extending expert deadlines state "Plaintiff's expert

19

witnesses deadline" and "Defendant's expert witness deadline," the failure to include "counter-plaintiff" and "counter-defendant" may have been perceived as an informal reference and the court's actual order—entered after this email communication—states the deadline is for both plaintiff and counter-plaintiff. *Compare* Dkt. 83, Ex. 40-D (December 2015 email string), *with* Dkt. 56 (March 8, 2016 scheduling order). Second, the court is also not convinced that the testimony is offered as rebuttal testimony. Hackett's failure to discuss Smith's report is telling in this regard.

The court, therefore, must determine whether the report should be permitted even though it was untimely. Since the expert report was not timely filed under the court's scheduling order, the court may modify the deadline only if Suncor shows good cause for failing to timely file the report. *See* Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."). "To show good cause, the party seeking to modify the scheduling order has the burden of showing 'that the deadlines cannot reasonably be met despite the diligence of the party needing the extension.'" *Squyres v. Heico Cos., L.L.C.*, 782 F.3d 224, 237 (5th Cir. 2015) (quoting *Filgueira v. U.S. Bank Nat'l Ass'n*, 734 F.3d 420, 422 (5th Cir. 2013)). To determine if there is good cause, the court must consider:

> "(1) the explanation for the failure to timely [comply with the scheduling order];
> (2) the importance of the [modification];
> (3) potential prejudice in allowing the [modification]; and
> (4) the availability of a continuance to cure such prejudice."

*Id.* (quoting *Meux Surface Protection, Inc. v. Fogleman*, 607 F.3d 161, 167 (5th Cir. 2010)).

Musket asserts that all these factors weigh in its favor because (1) Suncor did not designate Hackett until after the deadline and had no justifiable reason for failing to do so; (2) Suncor obviously does not find the testimony very important as it only included one sentence about the counterclaim in the expert report and did not timely designate; (3) the failure to comply is harmful

and prejudicial to Musket because it undermined Musket's ability to designate a counter-defendant designation; and (4) a continuance is prejudicial to Musket. Dkt. 76 at 24–25.

Suncor, on the other hand, argues that all of the factors weigh in its favor. Dkt. 83 at 19. First, Suncor asserts that it reasonably believed that the parties had an understanding that all of its designations should be made on May 3, 2016, and its failure to do so was not malicious or callous. *Id.* Second, Suncor contends that Musket is not prejudiced by the failure to disclose earlier because Musket had Hackett's report two months before the close of discovery and before all but one of the depositions of fact witnesses was taken and had almost two months to prepare for Hackett's deposition. And, in fact, Musket questioned Hackett about his opinions with regard to the counterclaims. *Id.* at 20. Third, Suncor contends that the testimony is important because Musket's expert attacked Suncor's counterclaims in his expert report and Suncor should have the opportunity to rebut the claims. *Id.* Finally, Suncor asserts that a continuance is not necessary because Musket was able to depose Hackett about these opinions. *Id.* at 21.

The court agrees that the factors weigh in Suncor's favor. Even though the expert disclosure was not timely, Musket had ample opportunity to explore Hackett's opinions about the counterclaim during discovery. Musket's motion to strike the testimony relating to counterclaims as untimely is DENIED.

## C.    Fjeld-Hansen

Fjeld-Hansen is a non-retained expert who is the managing director and a vice president of Musket. Dkt. 86, Ex. A. He is designated to testify about Musket's operations, the crude oil value chain, typical industry practices in the logistics of the crude-oil market, the investment in midstream crude-oil infrastructure, the interpretation of the parties' obligations and the reasonableness in the

21

industry of their performance of these obligations, and rebuttal testimony as to any claim by Suncor relating tho the Agreement, market conditions, industry practices, and alleged damages.  *Id.*

Suncor asserts that Musket did not provide an expert report for Fjeld-Hansen in violation of the court's scheduling order and that Fjeld-Hansen's opinion offering rebuttal evidence to Suncor's expert at Fjeld-Hansen's deposition, which was after the rebuttal expert deadline, was untimely. Dkt. 77.  Additionally, Suncor contends that Fjeld-Hansen has no specialized knowledge in the interpretation of the Agreement and that his testimony will not be helpful to the trier of fact.  *Id.* Suncor also objects that Fjeld-Hansen's purported opinions of the meaning and legal effect of the Agreement's provisions.  *Id.*  Suncor contends that Musket is offering Fjeld-Hansen as an expert "simply so that he can opine of legal issues and draw legal conclusions about the Agreement, while testifying on matters about which he lacks any personal knowledge."  *Id.*

Musket notes that Fjeld-Hansen is a non-retained expert who is qualified to testify and that his testimony will be helpful to the trier of fact.  Dkt. 86.  Musket contends that Federal Rule of Civil Procedure 26(a)(2)(C) specifically exempts non-retained experts from filing an expert report.  *Id.* Musket asserts that Fjeld-Hansen did not offer any new rebuttal opinions during his deposition, and Musket contends that Fjeld-Hansen is qualified to testify as to non-legal conclusions regarding the Agreement because of his experience on matters relating to such agreements.  *Id.*  Musket also argues that none of Fjeld-Hansen's opinions are impermissible legal conclusions.  *Id.*

First, the motion to exclude Fjeld-Hansen's testimony because he did not file an expert report is DENIED for the same reasons the court denied this argument with regard to the motion to exclude Doug Lumry's testimony.  *See* Dkt. 109.

As far as rebuttal testimony, Suncor contends that Fjeld-Hansen provided rebuttal testimony at his deposition on June 15, 2016, and that it is untimely because under Federal Rule of Civil

Procedure 26(a)(2)(d)(ii) rebuttal evidence must be disclosed within thirty days after the other party disclosed the evidence to be rebutted. Dkt. 77. Suncor contends that Fjeld-Hansen's testimony was in rebuttal to its expert's report and that the deposition occurred two weeks after the thirty-day deadline to submit rebuttal testimony. *Id.* Suncor asserts that this caused it harm because its expert was unable to address the rebuttal testimony before the end of discovery. *Id.*

Musket notes that Suncor did not even identify which testimony was "rebuttal testimony." Dkt. 86. Moreover, Musket contends that all of Fjeld-Hansen's testimony relating to Suncor's expert "was covered in Mr. Fjeld-Hansen's disclosures." *Id.* Finally, Musket asserts that even if the testimony were actually rebuttal testimony, Suncor had sufficient time to depose Fjeld-Hansen about these opinions and cannot claim unfair surprise. *Id.*

In its response, Suncor asserts that Musket's counsel "is unfamiliar with what rebuttal testimony is" and suggests that Musket review pages 290 through 323 of Fjeld-Hansen's deposition as Fjeld-Hansen "clearly identifies it." Dkt. 92. This is not helpful. It is the *court*, not Musket, that needs to know why Suncor believes the testimony is rebuttal testimony, as the court needs to determine if it should grant Suncor's motion to strike the testimony for this reason. The court should not be tasked with parsing through thirty-three pages of deposition testimony in an attempt to figure it out. Suncor's motion to strike the testimony because it is rebuttal testimony is DENIED.

Suncor next contends that Fjeld-Hansen is not qualified to testify under Federal Rule of Evidence 702. Dkt. 77. It asserts that Fjeld-Hansen is not qualified to testify about the meaning, interpretation, or parties' obligations under the Agreement. *Id.* It contends, moreover, that Fjeld-Hansen's testimony is unhelpful to the jury and contains impermissible legal conclusions. *Id.* Musket asserts that Fjeld-Hansen is qualified to supply his opinions related to the Agreement due to his work history and training in the crude-by-rail industry. Dkt. 86. Musket notes that Fjeld-

Hansen has over twenty-five years of experience in the oil business and has worked with take-or-pay agreements in the past with language that is conceptually similar to the Agreement. *Id.* Additionally, Fjeld-Hansen was involved in contract negotiation and thus had a hand in the language of the Agreement. *Id.*

The court finds that Fjeld-Hansen is qualified to testify about certain non-legal aspects of the Agreement and how it impacted the parties' actions. However, the court will not rely on any legal conclusions reached by Fjeld-Hansen when determining whether to grant summary judgment. Suncor's motion to strike because Fjeld-Hansen is unqualified and cannot render legal opinions is therefore GRANTED IN PART.

## IV. CONCLUSION

Suncor's motion to exclude Edwin Arthur Smith (Dkt. 75), Musket's motion to strike the testimony of David J. Hackett (Dkt. 76), and Suncor's motion to exclude Jon P. Fjeld-Hansen (Dkt. 77) are all GRANTED IN PART as outlined above.

Signed at Houston, Texas on December 20, 2016.

_____
Gray H. Miller
United States District Judge

24