**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

United States District Court
Southern District of Texas
**ENTERED**
January 18, 2017
David J. Bradley, Clerk

| | | |
|---|---|---|
| MUSKET CORPORATION, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION H-15-100 |
| | § | |
| SUNCOR ENERGY (U.S.A.) MARKETING, INC., | § | |
| | § | |
| *Defendant.* | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the court is a motion for summary judgment on defendant and counterclaimant Suncor Energy (U.S.A.) Marketing, Inc.'s ("Suncor") counterclaim filed by plaintiff and counterdefendant Musket Corporation ("Musket"). Dkt. 72. Having considered the motion, response, reply, record evidence, and applicable law, the court is of the opinion that the motion should be GRANTED IN PART.

## I. BACKGROUND

This case stems from a Master Agreement for Crude Oil Purchase, Sale or Exchange (the "MA") and a Physical Transaction Confirmation (the "Confirmation") (collectively, the "Agreement") entered into by Suncor and Musket. The parties contracted for Suncor to sell Niobrara crude oil or DJ Basin crude oil to Musket from April 1, 2013, through March 31, 2015, in quarterly "Committed Volumes" that increased during the contract term. Dkt. 79, Ex. A at Suncor000501.

On January 13, 2015, Musket filed a complaint in this court asserting that Suncor breached the Agreement by failing to deliver crude oil in the agreed-upon quantities. Dkt. 1. Musket has twice amended its complaint, and it asserts several claims in its most recent complaint: that Suncor (1) breached the Agreement by failing to deliver crude oil in the agreed-upon quantities; (2) failed to comply with the compensation provisions in the Agreement; (3) failed to comply with the confidentiality provisions of the Agreement; (4) fraudulently induced Musket to complete

enhancements to its Windsor Terminal to accommodate the volumes of crude oil required by the Agreement (the "Committed Volume"); (5) fraudulently represented that Suncor could meet the Committed Volume; and (6) breached the implied covenant of good faith and fair dealing. Dkt. 25. On October 6, 2015, the court dismissed Musket's claims for fraud, fraudulent inducement, breach of implied covenant of good faith and fair dealing, and its request for punitive damages. Dkt. 35.

In its original answer, Suncor asserted a counterclaim for breach of contract. Dkt. 12. Suncor amended its answer after the court dismissed portions of Musket's complaint. Dkt. 37. The amended answer incorporates the counterclaim that was contained in the original answer. *See id.* Suncor contends that Musket failed to accept the Committed Volume in the second, third, and fourth quarters of 2013 and throughout 2015. *Id.* Suncor asserts that Musket failed to comply with the Agreement because the Windsor Terminal was not capable of accepting the Committed Volume. *Id.* Suncor additionally notes that it experienced an "Interruption" as defined in the Agreement in July 2014 that negatively affected its ability to supply crude oil until November 2014. *Id.* Suncor's breach of contract counterclaim states, specifically, that "Musket materially breached its contract with Suncor by failing to comply with its terms and failing to purchase or receive the contractually-agreed crude oil volumes from Suncor." *Id.*

Musket now moves for summary judgment on Suncor's breach-of-contract counterclaim. Dkt. 72. Musket asserts that Suncor's breach claim arises out of paragraph (ii) of the Additional Provisions section of the Confirmation, which states:

> If Buyer's [(Musket)] failure to provide rail cars, as averaged over three (3) consecutive months, unreasonably interferes with Seller's [(Suncor)] ability to ratably deliver Product to the Windsor Terminal causing Seller to deliver to Alternate Buyer/Delivery Point, then Buyer agrees to pay Seller $1.50 for each barrel associated with and the said three (3) month period that Seller delivered to such Alternate Buyer/Delivery point.

2

Dkt. 72, Ex. A-1 at APP 023.  Musket argues that the first part of paragraph (ii) is a condition precedent to Musket's obligation in the second part of the paragraph and that Suncor has not met the condition precedent.  Dkt. 72.  Specifically, Musket contends that "Alternate Buyer/Delivery Point" is defined in the Confirmation as "mutually agreed upon alternate delivery point" and that Suncor cannot show that it delivered to a *mutually agreed upon* point.  *Id.*  Additionally, Musket contends that Suncor cannot show any three-month period during which Musket failed to provide rail cars and that Musket cannot prove damages.  *Id.*

Suncor argues, with regard to paragraph (ii), that there is a genuine issue of material fact about each element of its counterclaim because discovery revealed that Musket had inadequate rail cars during every month from October 2013 through July 2014 and November 2014 through March 2015.  Dkt. 79.  Suncor contends that "notice to Musket for Suncor to divert crude oil to an Alternate Buyer/Delivery Point is not required in the Agreement."  Dkt. 79 at 20 (citing Ex. A at Suncor000504).  Suncor argues that Musket is attempting to improperly incorporate language from a wholly separate provision of the Agreement that relates only to remedies when the parties cannot agree on a price.  *Id.* at 21.

This separate provision is "Alternative #1: Procedures if Parties Cannot Agree on Price."  *See* Dkt. 72, Ex. A-1 at APP 022.  Alternative #1 states:

> If after exhausting reasonable commercial efforts the Parties cannot agree on a price for a given Committed Volume then this Alternative #1 applies:
> Seller is relieved of its obligation to sell such applicable Committed Volumes to Buyer and may sell the applicable Committed Volume directly to a third party and at a mutually agreed upon alternate delivery point ("**Alternate Buyer/Deliver Point**"); provided that, Seller will reimburse Buyer for all of its direct cost associated with Buyer's operation of the Windsor Terminal, including freight, terminal fees, rail car leases at the rate of $1,200.00 (per rail car per month) plus a $2.75 per barrel fee.

3

> Prior to Seller selling to an Alternate Buyer/Delivery Point, Seller
> shall obtain Buyer's consent in respect to delivery to any Alternate
> Buyer/Delivery Point, with such consent not to be unreasonably
> withheld.  If the foregoing scenario applies, then Buyer shall provide
> its own rail cars as is necessarily required by Seller to deliver Product
> to an Alternate Buyer/Delivery Point for a given Pricing Period,
> unless otherwise agreed to by the parties.
> In the event that rail cars are not provided by Buyer for transportation
> of the Committed Volumes under this scenario, the Seller shall be
> under no obligation to pay or otherwise compensate Buyer for any
> costs, fees and/or expenses, whether direct or indirect, associated with
> the rail cars (including associated lease costs).

*Id.*  Suncor asserts that the "mutual agreement" discussed before the parenthetical "Alternate Buyer/Delivery Point" applies only to Alternative #1 because under Alternative #1 Musket would have to deliver the crude oil to the alternative buyer and delivery point with its own rail cars, whereas under paragraph (ii) Suncor is delivering the crude oil to an alternate buyer and delivery point because Musket did not provide rail cars. Dkt. 79.  Suncor argues that it would be nonsensical to read mutual agreement into paragraph (ii) because paragraph (ii) only applies when Musket fails to provide rail cars, and it does not make sense to require Musket to consent to Suncor taking the crude oil elsewhere when Musket could not accept it anyway.  *Id.* at 22.

Suncor argues that even if the court finds that mutual agreement and consent are conditions precedent to Suncor's ability to deliver the crude oil to an Alternate Buyer/Delivery Point, the evidence creates a genuine issue of material fact as to whether Musket agreed and consented because Musket was aware that Suncor delivered the crude oil to one of three locations when Musket turned away Suncor's crude oil.  *Id.* at 22–23.  As far as damages, Suncor notes that under New York law, which the parties agree applies to the Agreement, the plaintiff merely has to show the existence of damages at summary judgment stage, not the amount of damages.  *Id.* at 23.  Suncor presents

evidence of the existence of damages and has identified the amount sought for each category of damages permitted under the Agreement.  *Id.* at 24 (citing Irsik Dec. (Ex. K) paras. 4–6).

Finally, Suncor asserts that its counterclaim also derives from Musket's breach of paragraph (iii) of the Additional Provisions of the Agreement.  Dkt. 79 at 5.  Paragraph (iii) states:

> The Windsor Terminal is operated by the Buyer.  In its capacity as "operator", Buyer shall:
> . . .
> (iii) Use any and all reasonable commercial efforts to ensure that the Windsor Terminal has sufficient capacity to receive Product delivered by Seller at all times throughout the Term.

Dkt. 72, Ex. A-1 at APP 023.  Suncor asserts that the damages for Musket's breach of paragraph (iii) are outlined in § S, which sets forth Musket's liability for failing to purchase crude oil in accordance with the Agreement.  Dkt. 79 at 6 (quoting § S).  Suncor contends that Musket failed to ratably receive crude oil from Suncor and to provide adequate capacity at the Windsor Terminal.  *Id.*  Suncor presents evidence that it delivered as much crude oil to the Windsor Terminal as the terminal was capable of ratably receiving and argues that Musket was unable to accept crude oil "not only because of Musket's failure to provide sufficient railcars . . . but also as a result of ongoing capacity limitations at the Windsor Terminal due to a lack of railcars, inadequate tank storage, delays in terminal expansion, equipment failures, inadequate loading rates, and missed train switches."  *Id.* at 7 (citing Dkt. 79, Exs. N-25, N-27, N-37, N-61, N-65, N-68, N-77, N-82, N-88, N-102, N-143, N-175, and B (Henry Dep.)).  Suncor asserts that "Musket had unrealistic deadlines for its Windsor Terminal to be expanded and completely operational to ramp up to 20,000 [barrels per day ("bpd")]."  *Id.* at 10.  Suncor notes that "Musket's own employees admitted that 20,000 bpd was unachievable based on the current infrastructure" as Musket had approximately 67,000 barrels of total storage capacity and needed 80,000 barrels of storage capacity to operate and receive 20,000 bpd.  *Id.* at 13.

5

In reply, Musket continues to assert that "Alternative Buyer/Delivery Point" is a defined term in the Agreement requiring "mutual agreement."  Dkt. 80.  Musket argues that it was perfectly rational for the parties to agree that they needed to work together if Suncor asserted during the Agreement's term that it was forced to divert its crude oil elsewhere.  *Id.* at 1 n.1.  Musket contends the plain language of the agreement requires mutual agreement and that the "Court should therefore reject Suncor's unilateral attempt to rewrite the parties' agreement."  *Id.* at 2.  Moreover, Musket argues, Suncor has not shown that it actually had enough crude oil to fulfill its contracts in the Rockies region.  *Id.* at 3.

With regard to Suncor's argument that Musket breached both paragraph (ii) and paragraph (iii) of the confirmation, Musket asserts that Suncor cannot now assert a claim under paragraph (iii) as both its live pleading and its Rule 30(b)(6) corporate witness confine the claim to paragraph (ii).  *Id.* at 3.  Musket additionally points out that the counterclaim does not mention § S damages.  *Id.*  Musket asserts, moreover, that even if Suncor had pled the claim, it failed to provide any evidence of the commercial standards governing Musket's obligation to "use any and all reasonable commercial efforts to ensure that the Windsor Terminal has sufficient capacity."  *Id.* at 4.  Musket argues that Suncor is required to put forward such evidence to show a breach of the obligation to use reasonable commercial efforts.  *Id.* at 5.

## II. Legal Standard

A court shall grant summary judgment when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "[A] fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party."  *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).  The

6

moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). If the party meets its burden, the burden shifts to the non-moving party to set forth specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e). The court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant. *Envtl. Conservation Org. v. City of Dall., Tex.*, 529 F.3d 519, 524 (5th Cir. 2008).

## III. ANALYSIS

The court will first consider whether there is a question of material fact as to Suncor's counterclaim that Musket breached paragraph (ii) of the Agreement. It will then consider whether Suncor has asserted a claim under paragraph (iii) and, if so, whether summary judgment is proper on that claim.

### A.    Paragraph (ii)

Musket asserts three different grounds for summary judgment on Suncor's claim that Musket breached paragraph (ii) of the Agreement: (1) that the Alternate Buyer/Delivery Point required mutual agreement and there was no mutual agreement; (2) that, regardless, Suncor has no evidence of a three-month period of interference; and (3) that Suncor has no evidence of damages.

In order to determine if Musket is entitled to summary judgment on Suncor's claim that Musket breached paragraph (ii), the court must first determine whether the contractual term "Alternate Buyer/Delivery Point" required mutual agreement. If so, then the court must consider whether Suncor has presented enough evidence of mutual agreement to survive summary judgment.

As noted in the background section, *supra*, the term "Alternate Buyer/Delivery Point" is contained in both paragraph (ii) and in Alternative #1. There is no "definitions" section in the Confirmation, but the term "Alternate Buyer/Delivery Point" is capitalized and in bold the first time

7

it is used, as are other terms contained within the Confirmation such as "Term," "Committed Volumes," and "Windsor Terminal." *See generally* Dkt. 72, Ex. A-1. The first time the term "Alternate Buyer/Delivery Point" is used in the Confirmation is in Alternative #1. The term is next used in paragraph (ii). It is not in bold in paragraph (ii), but it is capitalized. The fact that the term, like other important terms in the contract, is bold and capitalized the first time it is used gives credence to Musket's contention that it is a *defined* term. The question, however, is what exactly is the definition? While Musket contends the definition is a "third party and at a mutually agreed upon alternate delivery point," which is the phrase immediately preceding the parenthetical of the bold term "Alternate Buyer/Delivery Point," Suncor contends that the "mutually agreed upon" portion of that phrase does not even make sense if one were to consider it part of the definition of the term as it is used in paragraph (ii). Dkts. 72, 79. Suncor thus appears to argue that "Alternate Buyer/Delivery Point" merely means what is says—a different buyer and delivery point.

The problem with Suncor's argument is that, under New York law, "the entire contract must be reviewed and [p]articular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby." *Givati v. Air Techniques, Inc.*, 960 N.Y.S.2d 196, 198 (N.Y. App. Div. 2013) (internal citations and quotations omitted). A "court should not read a contract so as to render any term, phrase, or provision meaningless or superfluous." *Id.* A "court should seek an interpretation which fulfills the parties' reasonable expectations . . . and which gives all parts of the contract full force and effect." *Id.* at 199. A contract that "is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *NRT N.Y., LLC v. Harding*, 16 N.Y.S.3d 255, 258 (N.Y. App. Div. 2015) (internal quotations omitted). "To determine whether a writing is unambiguous, language should not be read in isolation because the contract must be considered as

a whole." *Id.* (internal quotations omitted).  "If the language of the contract is susceptible of more than one reasonable interpretation, the contract will be considered ambiguous."  *Id.*  When construing the contract, "the court should arrive at a construction which will give fair meaning to all of the language employed by the parties to reach a practical interpretation of the expression of the parties so that their reasonable expectations will be realized."  *Id.*

Here, when the court looks at the Confirmation as a whole, it is clear that the defined terms in the contract are capitalized and in bold at the time the terms are defined.  If the parties did not intend for the definition of "Alternate Buyer/Delivery Point" used in Alternative #1 to apply to the entire agreement, or they intended for "Alternate Buyer/Delivery Point" to mean something else in paragraph (ii), then they could have used a different uncapitalized and nonbold term in each paragraph.  Instead, these sophisticated parties agreed to use the capitalized and bold term that had previously been used and defined in Alternative #1 in paragraph (ii).  Thus, the only reasonable interpretation of the contract is that the definition used in Alternative #1 applies to the term in paragraph (ii).  While the court understands Suncor's argument that requiring mutual agreement makes more sense as the term is used in Alternative #1 than as it is used in paragraph (ii), the court agrees with Musket that it is not necessarily "nonsensical" to require mutual agreement when the parties must work together to execute the Agreement.  Because Suncor agreed to contractual language that includes the defined term, Suncor agreed to obtain mutual agreement before diverting its crude oil elsewhere when Musket was unable to take it.

Suncor argues that, regardless, it has enough evidence of mutual agreement to raise an issue of material fact.  Suncor presents evidence that it communicated to Musket that it would deliver crude oil that Musket could not take due to a lack of rail cars to three alternate buyers or delivery points.  Dkt. 79, Ex. K ¶ 6.  Suncor's crude oil trader asserts that "Musket never prohibited the

delivery of crude oil to these three Alternate Buyers/Delivery Points when Suncor was unable to deliver crude oil to Windsor Terminal due to lack of railcars." *Id.* Communicating that one is delivering elsewhere coupled with a failure to prohibit delivery is not the same as mutual agreement to the buyers and delivery points.

Suncor also provides an email from December 7, 2013, in which Musket informs Suncor that it is "about at capacity at Windsor" and would "have to start turning trucks away as early as tonight if we don't back off." Dkt. 79, Ex. N-52. In the same email strand Musket later asks if Suncor had "started diverting the 90% of [its] trucks to other sites per [Suncor's crude oil trader's] email." *Id.* Then there is internal discussion among Suncor employees about diverting the crude oil to another location as soon as the other location opened. *Id.* This is evidence that Musket was aware that Suncor would divert and where. It is not evidence of mutual agreement as to the alternate delivery point. Moreover, even if it were, it only relates to one day.

The next email presented states that it will be difficult to keep oil at Windsor Terminal and then divert it when there are no trains "but that's the way its going to have to work." Dkt. 79, Ex. N-129. Again, this email is not evidence of mutual agreement as to the alternate delivery point and buyer, it simply shows that Musket knew that some oil would be diverted.

The next email string offered is dated June 10, 2014. Dkt. 79, Ex. N-148. It begins with an email from Suncor to Musket asking for an update on the Windsor Terminal. *Id.* Musket responded that it did not have a train due until 11 p.m. and likely could not take trucks until the next morning. *Id.* Suncor asked when it could "tell the trucks to start up" and Musket responded that the trucks could be brought in around 4 a.m. *Id.* Things went downhill from there, as the next estimate was that Musket would not have cars until 3 a.m., and then 7 a.m. *Id.* At 9:48 a.m., Musket advised that the "set finally landed" and it could start taking trucks in about three hours. *Id.* Suncor said that its

10

"backup option" was "close to full" and that it would start to "pile trucks in on" Musket shortly.  *Id.* At 1:30 p.m. Suncor advised that the "site" was "telling trucks they won't be open until 4 p.m."  This email indicates that clearly there was an issue with the trains that day.  But there is no mutual agreement in this email for Suncor to take its crude oil to an alternate buyer.

Suncor argues that Musket "directed Suncor to these locations."  Dkt. 79 at 23.  Suncor does present evidence that on February 4, 2015, Musket updated Suncor on Windsor's capacity and advised that "Cheyenne has room for 19 loads."  Dkt. 79, Ex. N-81.  While the court could infer mutual agreement on this one date from Musket's reference to Cheyenne's capacity, this one date of mutual agreement is not enough evidence that there was an issue with the rail cars for a period of three months and that the parties agreed during this extensive period of time on alternate buyers and delivery points.

Because the court finds that there is insufficient evidence of mutual agreement, Suncor has not presented an issue of material fact for its claim that Musket breached paragraph (ii) of the Confirmation.  Accordingly, Musket's motion for summary judgment on Suncor's breach-of-contract counterclaim, to the extent it stems from paragraph (ii), is GRANTED and that claim is DISMISSED.

## B.  Paragraph (iii)

Musket asserts that Suncor's breach-of-contract counterclaim is confined to paragraph (ii), and Suncor argues that it is also asserting a breach of paragraph (iii).  Dkts. 72, 79.  Musket contends that the counterclaim does not include a claim for breach of paragraph (iii) and that it is too late to add one now.  Dkt. 80.  Musket asserts that it had no notice that Suncor believed paragraph (iii) and damages under § S were implicated because these claims were not discussed in the counterclaim and Suncor's corporate witness testified that Suncor's damages were calculated based on the $1.50 per

barrel liquidated damages discussed only in paragraph (ii). *Id.* Moreover, Musket points out that Suncor has not provided any evidence of the standards governing "reasonable commercial efforts," which would be necessary to prove a claim under paragraph (iii). *Id.* This argument about reasonable commercial efforts, however, was made in Musket's reply, not in its motion. *See* Dkt. 72 (motion); Dkt. 80 (reply).

First, the court must determine whether Musket had sufficient notice that Suncor's breach-of-contract counterclaim includes a claim for breach of paragraph (iii). Then, if Suncor may present the claim, the court must determine whether it can consider Musket's argument that Suncor has no evidence of "reasonable commercial efforts" since that argument was raised for the first time in Musket's reply.

### 1.    Notice of Counterclaim Under Paragraph (iii)

As to the first issue, the court finds that Suncor's counterclaim is broad enough to encompass a claim under paragraph (iii). The court agrees that the counterclaim specifically discusses the damages available under paragraph (ii) and fails to specifically mention § S damages. *See* Dkt. 12 ¶¶ 53–54 & n.1. However, notwithstanding this one example of specificity, the complaint speaks in general terms about how the Windsor Terminal was incapable of "consistently, reliably, or ratably accepting the committed volume," how Suncor trucks were turned away, and how Suncor "suffered significant damages" due to "Musket's inability to accept the committed volumes." Dkt. 12 ¶¶ 53–54. The breach of contract claim indicates that "Musket materially breached its contracts with Suncor by failing to comply with its terms and failing to purchase or receive the contractually-agreed crude oil volumes from Suncor," and the prayer requests "all damages resulting from Musket's breach of contract." *Id.* at 9–10. The court finds that this language about what actions caused the breach encompasses a claim for a breach of paragraph (iii), which requires Musket to use

"reasonable commercial efforts to ensure that the Windsor Terminal has sufficient capacity to receive Product delivered by Seller." Additionally, the general language about damages is sufficient to assert a claim for § S damages.

With regard to Suncor's Rule 30(b)(6) deposition testimony, Suncor's corporate representative testified, when asked if "Suncor believes Musket owes it . . . damages," that he did not have "the exact dollar figure in front of [him]" but that Suncor "calculated [damages] based on the provisions" of the Agreement. Dkt. 72, Ex. B-4 at APP 067. He went on to explain that the calculation was "[a]ny volume that [Musket] could not accept, times the . . . $1.50 per barrel fee, outlined in the physical transaction confirmation." *Id.* He reiterated later that the formula for damages was "based on the confirmation of $1.50 per barrel, times whatever Musket could not receive." *Id.* at APP 068. He then stated multiple times that he could not provide the amount of damages at that time. *Id.* at APP 068–069. The court understands that damages under § S of the Agreement are not based on $1.50 per barrel but on "the positive difference . . . between the amount that would have been payable under the Agreement for the non purchased Quantity and the amount that the Seller receives in disposing of an equivalent Quantity of such crude oil at the Delivery Point," and that if Musket were relying solely on the deposition testimony of Suncor's corporate representative to ascertain what damages Suncor seeks, Musket could reasonably presume that the only damages sought were in connection with paragraph (ii). However, since the counterclaim itself discusses problems with the Windsor Terminal, *see* Dkt. 12 ¶¶ 53–54, and paragraph (iii) is about Musket's obligation to "ensure the Windsor Terminal has sufficient capacity to receive Product," *see* Dkt. 72 Ex. A-1 at Suncor000504, Musket had sufficient notice that the general breach in the counterclaim was of obligations in both paragraphs (ii) and (iii).

### 2. Timeliness of Argument

"Arguments raised for the first time in a reply brief are generally waived." *Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010); *see Guzman v. Hacienda Records & Recording Studio, Inc.*, No. 6:12-cv-42, 2013 WL 623289, at *4 (S.D. Tex. Feb. 19, 2013); *Brown v. DG Marine Transp. LLC*, No. 3:12-cv-38, 2013 WL 1404815, at *1 n.1 (S.D. Tex. Apr. 5, 2013); *see also* Hon. David Hittner, Federal Civil Procedure Before Trial § 12.107 (5th Cir. ed. 2008) ("Reply papers should be limited to matters raised in the opposition papers. It is improper for the moving party to 'shift gears' and introduce new facts or different legal arguments in the reply brief than presented in the moving papers."). However, "[a] reply brief may properly address new matters raised in the opposition brief if the issues *reasonably* were unforeseen at the time of the opening brief." Hittner, *supra*, § 12.107. The court, however, "*must* afford the opposing party a reasonable opportunity to respond" if relying on material presented for the first time in the reply brief. *Id.*

Here, the court understands why Musket did not anticipate the argument regarding paragraph (iii) in its original motion, though it is reticent to rule that it was a reasonably unforeseen argument. Regardless, in the interest of justice and judicial efficiency, the court finds that the best course is to allow Suncor to *briefly* respond to the argument that it has no evidence of "reasonable commercial efforts" rather than deeming the argument waived. Suncor is ORDERED to file a surreply addressing *only* whether it has evidence that Musket failed to use commercially reasonable efforts to ensure the Windsor Terminal had sufficient capacity. This surreply is due within fifteen (15) days of the date of this order and shall be confined to five (5) pages. No further briefing on the issue will be accepted.

14

## IV. Conclusion

Musket's motion for summary judgment on Suncor's breach-of-contract counterclaim is GRANTED IN PART. Suncor's counterclaim, to the extent it asserts that Musket breached paragraph (ii) of the Confirmation, is DISMISSED. The court defers ruling on whether summary judgment should be granted on the claim that Musket breached paragraph (iii) of the Confirmation until it receives the additional briefing requested in Part III.B.2, *supra*.

Signed at Houston, Texas on January 18, 2017.

_____
Gray H. Miller
United States District Judge