United States District Court
Southern District of Texas

**ENTERED**

February 15, 2017

David J. Bradley, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| MUSKET CORPORATION, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION H-15-100 |
| | § | |
| SUNCOR ENERGY (U.S.A.) MARKETING, INC., | § | |
| | § | |
| *Defendant.* | § | |

### MEMORANDUM OPINION AND ORDER

Pending before the court is a motion for summary judgment filed by defendant Suncor Energy (U.S.A.) Marketing, Inc. ("Suncor"). Dkt. 73. After considering the motion, response, supplement to the response, reply, and applicable law, the court is of the opinion that Suncor's motion for summary judgment should be GRANTED IN PART AND DENIED IN PART.

### I. BACKGROUND

This is a breach of contract dispute involving an agreement for the delivery of crude oil. Suncor agreed to supply crude oil by rail to Musket Corporation ("Musket") at Musket's Windsor Terminal in Colorado (the "Windsor Terminal"). The parties entered into a Master Agreement for U.S. Crude Oil Purchase, Sale or Exchange Transactions (the "Master Agreement") on April 1, 2013. Dkt. 73, Ex. A. They also signed a Physical Transaction Confirmation on the same day, which incorporated the Master Agreement. *Id.* Both the Master Agreement and the Physical Transaction Confirmation contain clauses indicating that, in the event of a conflict between the two documents, the Master Agreement is subordinate to the Physical Transaction Confirmation. *See id.* The court will refer to the Master Agreement and the Physical Transaction Confirmation collectively as the "Agreement."

The Physical Transaction Confirmation sets forth the term of the agreement (April 1, 2013 through March 31, 2015), the volumes of crude oil Suncor committed to deliver to Musket at the Windsor Terminal for each quarter during that term (the "Committed Volumes"), alternatives if the parties could not agree to a price or identify a profitable market for the Committed Volumes, payment terms, and certain "additional provisions." *Id.* The Physical Transaction Confirmation also specifies that once the parties agreed to pricing during an agreed-upon pricing period they would memorialize the "understanding" and "set it out on a separate confirmation sheet." *Id.* A template of the separate confirmation sheet was attached to the Physical Transaction Confirmation. *Id.* The parties entered into these separate "understandings" on a month-to-month basis. The court will refer to the separate confirmation sheets that memorialized the "understandings" collectively as the "Confirmations of Transaction."

On January 13, 2015, Musket filed a complaint in this court asserting that Suncor breached the Agreement by failing to deliver crude oil in the agreed-upon quantities. Dkt. 1. Musket has amended its complaint twice and the court has dismissed some of Musket's claims. *See* Dkts. 17 (first amended complaint), 25 (second amended complaint), 35 (order on motion to dismiss). Musket currently asserts the following claims: (1) breach of the Agreement by failing to deliver crude oil in the agreed-upon quantities; (2) breach of the Agreement by failure to comply with the compensation provisions in the Physical Transaction Confirmation; and (3) breach of the Agreement by failing to comply with the confidentiality provisions. Dkts. 25, 35. Musket also seeks attorneys' fees. Dkt. 25.

Suncor asserts various counterclaims and affirmative defenses. Dkts. 12, 37. Suncor contends that Musket failed to comply with the Agreement because the Windsor Terminal was not

capable of accepting the Committed Volume at certain times during the term of the Agreement. Dkt. 37.  Suncor additionally contends that an "Interruption" as defined in the Agreement negatively impacted its ability to supply crude oil until November 2014.  *Id.*

Suncor now moves for summary judgment on Musket's claims, contending that (1) Musket has no evidence of damages for its breach of contract for failure to deliver crude oil claim; (2) Musket has no evidence that the conditions precedent are met for its breach of contract for failure to comply with the compensation provisions claim; (3) Musket failed to comply with the written notice provision of the Agreement; (4) Musket has no evidence of damages for its breach of contract for failure to comply with the confidentiality provision claim; and (5) Musket cannot recover attorneys' fees. Dkt. 73.  Musket argues that it has some evidence for each of its claims and takes issue with the way Suncor interprets the Agreement. Dkt. 88.  Musket also contends that nominal damages are available for its breach of the confidentiality provision claim and that it may recover attorneys' fees in this case.  *Id.*

The court will first discuss the legal standard for summary judgment motions.  It will then address each of Suncor's arguments *in seriatim*.

## II. LEGAL STANDARD

A court shall grant summary judgment when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "[A] fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party."  *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986).  If the party meets its

burden, the burden shifts to the non-moving party to set forth specific facts showing a genuine issue

for trial. Fed. R. Civ. P. 56(e). The court must view the evidence in the light most favorable to the

non-movant and draw all justifiable inferences in favor of the non-movant. *Envtl. Conservation Org.*

*v. City of Dall., Tex.*, 529 F.3d 519, 524 (5th Cir. 2008).

### III. ANALYSIS

The court will first consider Suncor's arguments that Musket lacks evidence to support its

claims. It will then turn to whether partial judgment should be granted in Suncor's favor due to lack

of notice and whether Musket may assert a claim for attorneys' fees.

### A. Failure to Deliver Crude Oil

Suncor argues that Musket cannot show there is an issue of material fact that Suncor should

be held liable under the Agreement for failure to deliver for crude oil for two reasons. Dkt. 73. First,

Suncor argues that Musket failed to seek alternative sources of crude oil—or cover—as required by

the Agreement, and that Musket therefore cannot prove damages under the contract because the

damages provision is contingent on reasonable costs to cover. *Id.* Second, Suncor contends that

Musket is barred from seeking damages because the Agreement specifically precludes consequential

damages. *Id.* Musket argues that neither of the contractual provisions relied upon by Suncor for

these arguments is applicable. Dkt. 88.

### 1. Failure to Cover

Suncor argues that Musket's alleged damages are barred because Musket failed to cover its

damages as required by § S(b) of the Agreement.[1] Dkt. 73. Under § S(b), Suncor's liability for

---

[1] Section S(b) is contained in the Amendments to ConocoPhillips General Provisions for
Domestic Crude Oil Agreements document that were attached to the Master Agreement. *See* Dkt.
73, Ex. A at Suncor000493, Suncor000497. The Master Agreement incorporates the General

4

failure to deliver crude oil is "limited to the positive difference, if any, between reasonable costs that are incurred by [Musket] to purchase an equivalent quantity of crude oil at the [Windsor Terminal] and the amount that would have been payable under this Agreement for the non delivered Quantity." Dkt. 73, Ex. A at Suncor000497 (§ S(b)).  According to Suncor, Musket admitted—in response to Suncor's requests for admission—that it did not purchase crude oil from other suppliers.[2]  Dkt. 73. Musket does not contest this assertion.  *See* Dkt. 88.

Musket contends that the Confirmation's exclusivity provision mandates that Suncor be the *only* supplier of crude oil to the Windsor Terminal during the Agreement's term.  Dkt. 88 (citing Dkt. 88, Ex. C-2 (another copy of the Physical Transaction Confirmation) at MUSKET-SUNCOR_0111565).  Musket further argues that the parties agreed that in the event of a conflict between the Physical Transaction Confirmation and the Master Agreement, the Physical Transaction Confirmation's terms would be given effect.  *Id.* (citing Ex. C-1 (Master Agreement) § 2; Ex. C-2 (Physical Transaction Confirmation) at MUSKET-SUNCOR_0111567).  Thus, according to Musket, the exclusivity provision of the Physical Transaction Confirmation trumps the cover requirement of § S of the Master Agreement.  *Id.*  Musket argues that a construction giving effect to both § S and the exclusivity provision of the Confirmation is "not possible" and that the parties are limited to either cover damages or the alternative remedies set forth in the Physical Transaction Confirmation.

---

Provisions and Amendments.  *See* Dkt. 73, Ex. A at Suncor000486.

[2]  Suncor cites its Exhibit E for this assertion and refers to court to requests 71 through 94. *See* Dkt. 73 at 8–9.  Suncor indicates that Exhibit E is "Plaintiff's Responses to Defendant's First Requests for Admission."  *Id.* at 8.  However, Exhibit E is actually "*Defendant Suncor Energy (U.S.A.) Marketing, Inc.'s* Responses and Objections to Plaintiff's First Request for Admissions," and requests 71 through 84 do not relate to whether Musket purchased crude oil from other suppliers. *See* Dkt. 73, Ex. E at 18–21.  There are no requests 85–94.  *See id.*

*Id.*  Musket asserts that the parties provided a clear statement of their intent when they agreed that the Master Agreement was subordinate to the Physical Transaction Confirmation in the event of a conflict.  *Id.*  Musket notes that if the Agreement were non-exclusive, it could have arranged to obtain crude oil from other suppliers, but since it is exclusive, Musket was unable to avoid costs and was completely dependent on delivery by Suncor.  *Id.*  Musket argues that the "exclusivity provision makes avoidance of such damages impossible," and that if it had tried to cover, it would have been breaching the exclusivity agreement.  *Id.*  Further, Musket asserts that interpreting the contract to require a cover, which would put Musket in breach of the exclusivity agreement, would render the benefit to Musket illusory and deprive Musket of a remedy.  *Id.*

Suncor asserts in reply that the exclusivity provision has nothing to do with Musket's obligation to cover under § S(b).  Suncor cites *Lafarge Building Materials, Inc. v. Pozament Corp.*, No. 3333-04, 2010 WL 3398537 (N.Y. Sup. Ct. Aug. 24, 2010), in support of its argument that the exclusivity provision and the cover provision are not in conflict.  In *Lafarge*, the plaintiff, an operator of a cement manufacturing plant, had a contract with the defendant, a supplier of coal fly ash, in which the defendant agreed to pay the plaintiff a recycling fee to accept deliveries of fly ash. 2010 WL 3398537, at *1.  Under the contract, the defendant agreed to supply a minimum of 1,150 metric tons of fly ash a week and had a "qualified right to be the exclusive supplier of fly ash" during the term of the contract.  *Id.*  Specifically, the contract required that the defendant would coordinate with the plaintiff "to assure that the plant will not run out of flyash."  *Id.* at *2.  The agreement also set forth what would happen if the defendant could not meet the requirements.  *Id.*  It stated that the plaintiff had the "right to source additional flyash from alternate sources . . . allowing [the defendant] the first right of refusal to manage the material from the alternate sources."  *Id.*

The defendant had difficulty meeting the plaintiff's requirements, and the plaintiff found a supplemental supplier. *Id.* The plaintiff introduced the alternate supplier to the defendant, but the alternate supplier refused to let the defendant manage its materials. *Id.* at *10. The defendant eventually discontinued paying the plaintiff to accept its fly ash because it alleged that the plaintiff breached its exclusive rights under the contract. *Id.* at *3. A lawsuit eventually ensued, and the court unsurprisingly found that the plaintiff did not breach the exclusivity and right of first refusal clauses of the contract because construing the contract to preclude the plaintiff from obtaining fly ash when the supplemental supplier would not allow the defendant to manage its supply "would frustrate a fundamental object of the Agreement and the exception to [the defendant's] exclusivity established therein: keeping the Plant supplied with fly ash." *Id.* at *10. The court found that it was clear that the defendant's right of first refusal "was limited . . . to providing [the defendant] with an *opportunity* to manage the alternate source." *Id.*

The court finds that *Lafarge* is not entirely on point because the exclusivity clause in the *Lafarge* contract expressly outlined a procedure for the buyer to obtain the product if the supplier could not meet the supply requirements. Here, the exclusivity provision is not expressly "qualified" and does not specifically state what Musket is to do if Suncor is unable to meet Musket's needs. While there are provisions in the Physical Transaction Confirmation that may apply in certain situations where Suncor does not supply the Committed Volume (*see* Alternative #2, discussed further *infra*), the Physical Transaction Confirmation does not provide a remedy if those conditions are not met and Suncor does not meet the Committed Volume. When one considers the *entire* agreement, however, § 5(b) of the Master Agreement *does* say what Musket is to do if Suncor does not meet the volume requirements and the other provisions do not apply—Musket is required to

cover.  While the Agreement clearly indicates that the Physical Transaction Confirmation governs

if there is a conflict, § S(b) is not in conflict with the exclusivity provision.  If Suncor could not

provide the crude oil and none of the other provisions in the Physical Transaction Confirmation

applied, then § S(b) applied.[3]  Since Musket did not cover, it is not entitled to any damages under

§ S(b).

### 2.    Damages Barred by Agreement

Suncor next argues that Musket cannot obtain certain damages because they are prohibited

by § S(a) of the Agreement.  Dkt. 73.  Section S(a) specifies that the parties are not liable for "loss

of profits, . . . incidental, indirect or consequential loss or damages or any kind."  Dkt. 73, Ex. A.

Suncor argues that the damages Musket seeks are lost profits and consequential damages, both of

which are excluded under § S.  Dkt. 73.

Musket contends that, like § S(b), § S(a) is inconsistent with the Confirmation's exclusivity

provision.  Dkt. 88.  According to Musket, the damages language fits into a non-exclusive

transaction and does not make sense when there is an exclusivity provision that "makes avoidance

of such damages impossible."  *Id.*

Suncor notes, in reply, that Musket does not dispute that the damages it seeks fall within the

§ S(a) damages exclusion and instead asks the court to "ignore § S(a) entirely."  Dkt. 90.  Suncor

argues that there is *no* conflict between § S(a) and the exclusivity provision of the Confirmation.

*Id.*

---

[3]  This conclusion is buttressed by the fact that the exclusivity provision specifically notes
that "rights and remedies under this Transaction, the *Master Agreement*, or otherwise in law" are not
limited if Musket elects to terminate the Transaction because Suncor fails to deliver the contracted-
for volume.  *See* Dkt. 73, Ex. A at Suncor000505 (emphasis added).

The court agrees with Suncor for the same reason it concluded that there is no conflict between the exclusivity provision and § S(b).  Musket cannot recover the types of damages prohibited by § S(a).

Because Musket cannot show that it is entitled to the damages it seeks, Suncor's motion for summary judgment on Musket's claim that Suncor breached the Agreement by failing to deliver the agreed-upon quantities is GRANTED.

**B.      Failure to Comply with Compensation Provisions**

Musket claims that Suncor breached the compensation provisions (Alternative #1 or, alternatively, Alternative #2) of the Agreement.  Dkt. 25.  Suncor argues that neither of these provisions apply because Musket's witnesses have admitted that the parties always agreed on the price of oil to be sold during each month of the Agreement, and disagreement on price is a condition precedent to both Alternative #1 and Alternative #2.  Dkt. 73.  Additionally, Suncor contends that Alternative #2 only applies if the parties could not identify a profitable market for the crude oil, and there is no evidence that this ever occurred.  *Id.*  Musket does not disagree that the Alternatives both contain conditions precedent, but it argues that there is a genuine issue of material fact as to whether the conditions for Alternative #1 and Alternative #2 to apply were met.  Dkt. 88.

**1.      Price for a Given Committed Volume**

Alternative #1 is entitled: "Alternative #1: Procedure if Parties Cannot Agree on Price." Dkt. 73, Ex. A at Suncor000503.  Alternative #1 begins: "If after exhausting reasonable commercial efforts the Parties cannot agree on a price for a given Committed Volume then this Alternative #1 applies."  *Id.*  Thus, for Alternative #1 to apply, the parties must have (1) exhausted reasonable commercial efforts, yet (2) still been unable to agree on a price for a given Committed Volume.

Suncor asserts that all of the evidence indicates that there was no disagreement on price. Dkt. 73. Musket's trader testified that he did not recall specifically a profit or pricing issue, as opposed to volume issue, that caused Suncor to tell him that it could not deliver the Committed Volume. Dkt. 73, Ex. G at 80–81. Musket's managing director and vice president noted during his deposition that there were always negotiations but that Musket's trader would in the end "make concessions to make the – to consummate the transaction, and you can say he agreed to the price." Dkt. 73, Ex. C at 99. This same deponent testified that the parties reached agreement on price "with an expectation that some other form of value would replace the concession." *Id.* at 103–04. Suncor's traders also testified that the parties always agreed to a price. *See* Dkt. 73, Ex. D at 113 ("[W]e didn't argue on price much at all."); *id.* ("And we just kind of agreed on pricing every month, so . . . ."); *id.* at 114 ("But as far as the price was concerned, I mean, we really never had too much of an issue."); *id.* at 121 ("It was never a pricing issue. We always, you know, seemed to work through that, however the conditions were."); Dkt. 73, Ex. H at 100 ("I don't believe that ever occurred where we couldn't agree on a price at the terminal."); *id.* at 101 ("There was always an agreed price, yes, sir.").

Musket contends that, notwithstanding the above-noted testimony about agreement as to price, there is an issue of material fact as to whether the parties agreed on a price *for the committed volumes* each month. Dkt. 88. Musket provides a declaration by its managing director and vice president indicating that both parties "exhausted reasonable commercial efforts every month to determine a price for the Committed Volume" but that they "were not able to agree on a price for those Committed Volumes that were not included within the Parties' confirmations or agreements addressing . . . the delivery of discrete volumes for an upcoming month or period." Dkt. 88, Ex. C

10

¶ 19.  In unpacking that statement, the declarant provides an example wherein Suncor agreed to deliver 16,000 barrels per day in a month in which the Agreement required 20,000 barrels per day. *Id.*  They only agreed to the price for the 16,000 barrels, and obviously did not agree to a price on the 4,000 barrels that were not being delivered.  The declarant concluded that "for nearly every month of the Agreement, the Parties did not agree on a price for the *full Committed Volumes* set forth in the Confirmation."  *Id.* (emphasis added).

This declarant's deposition testimony clarifies this position, indicating that the parties agreed on the prices for the volume delivered but that Musket may have expected to get something in return for the concessions at a later date.  The declarant indicated several times that "there was an agreement on price, but with concessions."  *See* Dkt. 73, Ex. C at 103, 126.  He stated that he "would say it was an agreement on a price with the expectation that some other form of value would replace the concession."  *Id.* at 103.  He noted that the parties negotiated the prices and that Musket's trader would make concessions but "agreed to the price to further the relationship."  Dkt. 88, Ex. A-6 at 99.  These agreements were evidenced by written confirmations each month.  *See, e.g.*, Dkt. 88, Ex. C-3 ("Confirmation of Transaction" dated October 7, 2013, which memorializes a verbal agreement as to the volume and price of crude oil to be delivered from December 1, 2013 through December 31, 2013).

It appears from the testimony and Musket's vice president's declaration that Musket may not have been enthusiastic to agree to a certain price or volume each month and hoped that Suncor would return what Suncor considered to be a favor.  However, Musket has raised no issue of material fact indicating that it did not, indeed, agree to the prices for the volumes that were agreed to be delivered each month.  The parties agreed to these volumes and prices, and they were memorialized each

month in a document entitled "Confirmation of Transaction." *See id.* The provisions of the Agreement are incorporated in the Confirmations of Transaction, but each of these Confirmations of Transaction also indicates that, in the event of a conflict, "this Confirmation shall control." *See id.* Thus, notwithstanding the Physical Transaction Confirmation's requirement that Suncor provide a particular "Committed Volume" each month and the alternatives the Physical Transaction Confirmation offers for months when the parties could not agree on pricing for that volume (Alternative #1) or when they cannot identify a profitable market (Alternative #2), it is clear that when the parties could not reach an agreement for the purchase of the volume listed in the Physical Transaction Confirmation, for whatever reason, they modified the price *and* volume rather than following the alternatives in the Physical Transaction Confirmation. Thus, the Confirmations of Transaction indicate that the parties *agreed* to pricing for a *different* volume than the volume set forth in the original Physical Transaction Confirmation each month. If the Confirmations of Transaction indeed control, as they purport to do, then the Alternatives, which relate to the original Committed Volume rather than the modified volume, would not apply.[4] However, notwithstanding the language in the Confirmations of Transaction that indicate they control, they cannot serve to modify the terms of the Physical Transaction Confirmation unless the Confirmations of Transaction were in writing and were signed by both parties, both of which the Physical Transaction Confirmation requires for revisions. *See* Dkt. 73, Ex. A at Suncor000506 ("This Transaction . . . and the Master Agreement together constitute the entire agreement between the Parties relating to the

---

[4] The court notes that the Master Agreement appears to refer to the Physical Transaction Confirmation and all of the Confirmations of Transaction collectively as a "Confirmation" and indicates that the Master Agreement is subordinate to the "Confirmation." Dkt. 73, Ex. A at Suncor000486 (referring to "each transaction document," "all transactions," and "any transaction document" and defining "any transaction document" as a "Confirmation").

subject matter hereof . . . and can only be revised or amended in writing, signed by both Parties."). Here, since there is no evidence that the monthly Confirmations of Transaction were signed by both parties (*see* Dkt. 88, Exs. C-3, C-4), they cannot serve to modify the Committed Volume set forth in the Physical Transaction Confirmation.

Regardless, Musket has not provided evidence of an issue of material fact that the conditions precedent were met for Alternative #1 to apply. Musket has not come forward with an issue of material fact indicating that Suncor did not deliver the additional volume because the parties were unable to agree to a *price* for that volume. There is no email offered indicating that, for instance, Suncor stated that it could sell only 4,428 barrels per day rather than the Committed Volume of 20,000 barrels per day in March 2014 because Musket would not agree to a high enough price for the rest of the oil. Instead, all the testimony indicates that the parties did not quarrel about pricing.

The only evidence offered that there was in issue with pricing for the *Committed Volume* is the conclusory statement in Musket's managing director and vice president's declaration indicating that, despite exercising reasonable efforts, "the Parties were not able to agree on a price for those Committed Volumes that were not included within the Parties' confirmations or agreements addressing for the delivery of discrete volumes for an upcoming month or period." Dkt. 88, Ex. C ¶ 19. As support for this statement, he refers to two Confirmations of Transaction. *See id.* These Confirmations show the volume and price agreed upon for discrete periods of time. *See* Dkt. 88, Exs. C-3, C-4. This is not evidence that there was disagreement with regard to the *price* of the remaining volume. Alternative #1 only applies when there is an issue with price. Musket has not met its burden of showing this condition is met. Suncor's motion for summary judgment on this portion of Musket's claim is GRANTED.

## 2.    Identifying a Profitable Market

Alternative #2 is entitled: "Alternative #2: Procedure if Parties are unable to identify a Profitable Market."  Alternative #2 begins: "If after exhausting reasonable commercial efforts the Parties are unable to identify a profitable market for a given Committed Volume then this Alternative #2 applies."  *Id.*  Thus, for Alternative #2 to apply, the Parties must have (1) exhausted reasonable commercial efforts, yet (2) still been unable to identify a profitable market for a given Committed Volume.

Suncor argues that Alternative #2 cannot apply because (1) Alternative #2 requires the parties to have first failed to agree on a price; and (2) there is no evidence that the parties were unable to find a profitable market.  Dkt. 73.  As to the first argument, Suncor contends that agreeing to a price is "an integral condition precedent to Alternative #2."  *Id.*  Suncor presents deposition testimony from Musket witnesses indicating that they believed the parties must be unable to agree on a price before Alternative #2 was invoked.  *See id.*  This is because Suncor would not attempt to identify a profitable market between Suncor and a third party if Suncor and Musket agreed on the price.  *See id.* (citing Dkt. 73, Ex. B at 128–29).  During Musket's managing director and vice president's deposition, he agreed that under Alternative #2 "Suncor would have to decide that there [was] not a profitable market between Suncor and those third parties" and then Musket and Suncor would have to have decided that "there [was] no value, incremental value in moving it by rail and then they're going to pay us the $2.50 a barrel, take-or-pay fee."  Dkt. 73, Ex. B at 128–29.  The first step was for Suncor and Musket to attempt to negotiate the price; then, if they could not agree, Suncor had the right to market its barrels to "a higher netback market."  *Id.* at 129–33.

14

Musket contends that Suncor is inappropriately relying on misconstrued deposition testimony "to create contractual terms on price out of thin air." *Id.* Musket argues that its witness was confused during the testimony cited by Suncor, and it points to other testimony by this same witness in which he reaches the opposite conclusion. *Id.* During redirect, this same witness clearly agreed that Alternative #2 does not require that the parties could not agree on a price. Dkt. 73, Ex. A-8 at 276. Given this conflict, the court finds this witnesses' testimony unhelpful and not probative regarding what Alternative #2 requires or how it worked.

The court will instead refer to the plain language of Agreement. *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) ("Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation."). The condition precedent does not mention "price." While clearly price would generally be implicated in the discussion of whether a "profitable market" were identified, since the document does not say price, the court will not grant summary judgment solely on the absence of evidence that there was a disagreement on price.

That brings the court to the second part of Suncor's argument—that there is no evidence that the parties were unable to find a "profitable market." Musket asserts that Suncor has manufactured an "insurmountable hurdle" by arguing that Musket must present evidence that the parties were unable to identify a profitable market when the "take-or-pay provision in Alternative #2 was plainly meant to compensate Musket for Suncor's under-delivery." Dkt. 88 at 17. Musket argues that the "nature and history of the transactions show that the Parties were not able to identify a profitable market for the crude oil volumes Suncor did not deliver." *Id.* at 16 n.16. Musket provides testimony from its managing director and vice president indicating that Musket would provide prices and a

market at the terminal, but "Suncor rarely, if ever, shared [its] price discovery from the field while Musket always shared the price that we were going to transact that at the terminal; hence, the concept of unprofitable market, in my mind, is irrelevant because Suncor was not willing to share their margin picture."  Dkt. 88, Ex. A-6 at 94.  He continued: "So our automatic assumption – and the only assumption I see . . . that's valid here – is if you give somebody a market, they go out to fill that commitment, they will only do so if it's profitable.  Hence, any volume outside of that is deemed unprofitable."  *Id.* at 95.  Musket thus essentially asks the court to presume, based on this testimony, that since Suncor did not deliver the Committed Volumes, it must not have been able to identify a profitable market.  This same official states in his declaration:

> Indeed, if a profitable market for the sale of crude oil existed, it is my experience that a buyer and seller such as Musket and Suncor would agree to the sale of crude oil and the Seller would deliver the barrels. Suncor's failure to deliver the requisite barrels of crude oil shows the Windsor terminal was an unprofitable market under the contract.

Dkt. 88, Ex. C ¶ 22.  Essentially, then, Musket asks the court to presume that the parties must have been unable to identify a profitable market or else Suncor would have delivered the entire Committed Volume to Musket.

The problem with this theory is that even if common sense dictates that there must have been some kind of market reason for the parties' decision to reach agreement on the delivery of fewer barrels than the Committed Volume each month, this case is at the summary judgment stage and there must be *evidence* indicating that there is an issue of material fact that the parties exhausted reasonable commercial efforts and were unable to identify a profitable market before the court can apply Alternative #2.  The only evidence offered is a conclusory declaration by Musket's managing director and vice president, who assures the court that "[f]or nearly every month of the Agreement,

the Parties did not locate a profitable market for the full Committed Volumes in the Confirmation"
and that the "nature and history of the transactions show the Parties were not able to identify a
profitable market for the crude oil Committed Volumes Suncor did not deliver." Dkt. 88, Ex. C ¶ 21.
He does not cite to any exhibits or deposition transcripts to back up these assertions, and there is not
any statement in his declaration about exhausting reasonable commercial efforts for Alternative #2.

Musket states that it "could not control whether Suncor exhausted reasonable commercial
efforts to identify profitable markets or, similarly, did not . . . deliver barrels because of profitability
decisions of Suncor," but that "Musket continually sought a profitable market for crude oil and, if
Musket did not pursue a purchase of crude oil for sale to a downstream market, it was because
Musket could not identify a profitable market for that crude." Dkt. 88 at 16 n.16.  Musket's expert[5]
opines that Suncor delivered crude oil to a different terminal rather than Windsor during the term
of the Agreement because Suncor either did not have "(1) the crude purchases to profitably deliver
the contracted Windsor volumes and/or (2) Suncor made other contract performance or logistic
decisions based on profitability on where they delivered crude, including deliveries to pipeline
injection stations.  Either way, Suncor did not perform because Windsor was not a profitable market
for it." Dkt. 88, Ex. B ¶¶ 12, 15.  This is some evidence that *Suncor* was not able to identify a
profitable market, but it is not evidence of both parties exercising reasonable commercial efforts and
still being unable to identify a profitable market.  There is no testimony or evidence that Musket, for
instance, negotiated with Suncor and offered as high a price as it reasonably could to Suncor but

---

[5] Suncor moved to exclude this expert's testimony.  Dkt. 75.  The court granted the motion
only to the extent this expert draws legal conclusions and opines about a "rogue trader."  *See*
Dkt. 112.

Suncor could not take it because it would not have been profitable.   Instead, Musket offers unsupported conclusions and suppositions.

The Agreement clearly indicates that the parties would work together, yet Musket asks the court to rely on presumptions that it must not have been profitable or else Suncor would have delivered the full Committed Volume.   Musket argues that clearly Suncor contracted to a given Committed Volume and was supposed to either deliver that volume to the Windsor Terminal or pay a penalty, but the contract that Musket agreed to also has a conditions precedent that the parties exhausted reasonable commercial efforts and still were unable to identify a profitable market before the take or pay provision is activated.   Musket must show that there is an issue of material fact indicating that the parties did so in order to survive summary judgment and be paid.   Musket has failed to raise an issue of material fact.   Suncor's motions for summary judgment on Musket's claim for breach of Alterative #1 and, alternatively, Alternative #2, is GRANTED.

**C.     Failure to Comply with the Confidentiality Provision**

Musket contends that Suncor breached the confidentiality provision by filing a copy of the Agreement with its motion to dismiss Musket's first amended complaint.  Dkt. 25.  Suncor asserts that summary judgment should be granted in its favor on this claim because Musket cannot show that it incurred any damages due to Suncor's alleged failure to comply with the confidentiality provisions of the Agreement.  Dkt. 73.  Musket contends that nominal damages are available for breach of contract claims under New York law.[6]  Dkt. 88.  Suncor did not address this argument in its reply. *See* Dkt. 90.

---

[6]  Both parties agree that New York law applies to this contractual dispute.

Under New York law, "[n]ominal damages are always available in breach of contract actions." *Kronos, Inc. v. AVX, Corp.*, 81 N.Y.2d 90, 95 (N.Y. 1993). Thus, Suncor's argument that the court should enter summary judgment in its favor because Musket has no evidence of damages is not supported by the law, and Suncor's motion or summary judgment on this ground is DENIED.

**D.  Musket's Failure to Provide Written Notice of the Claims**

Suncor next seeks partial summary judgment on a portion of Musket's claims because Musket failed to provide Suncor with written notice of shortages during certain months. Dkt. 73. This is an alternative theory, and the court only addresses it in an abundance of caution. According to Suncor, § S of the Master Agreement requires that Musket to provide written notice within sixty days of the date of the delivery if Musket is alleging that Suncor did not deliver a sufficient quantity of crude oil. *Id.* Under § S,

> Any claim against [Suncor] under or in connection with [the] Agreement as to any deficiencies in Quantity or defects in Quality, must be made by written notice delivered to the Seller within sixty (60) days of the date of delivery or within sixty (60) days after notification of the correction of Quantity or Quality by the carrier or transporter (if applicable) along with the particulars supporting the claim. [Musket] waives any right and entitlement to any claim after the expiry of the foregoing sixty (60) day time period and releases [Suncor] from any and all liability for such claims.

Dkt. 73, Ex. A § S. Suncor contends that the first written notice Musket received was an email in September 2014 alleging shortages in August 2014 and that Musket also failed to provide written notice of claims alleging shortages in February and March of 2015 until it amended its complaint on May 15, 2015. *Id.* Suncor thus argues that Musket has waived any claims for alleged shortages before August 1, 2014, and between February 1, 2015 and March 31, 2015. *Id.*

19

Musket argues that the notice provision in the last paragraph of § S does not apply to claims for Suncor's delivery shortages under the Physical Transaction Confirmation.  Dkt. 88.  Instead, Musket asserts that Alternatives #1 and #2 provide a *new* procedure for the parties to follow if Suncor does not deliver the Committed Volumes.  *Id.*  Musket asserts that these alternatives relieve Suncor from delivering its committed volumes, so notice of a deficiency is inapplicable.  *Id.*  Musket also asserts that even if it were applicable, § S applies only to claims for individual loads, not longer-term deficiencies.  *Id.*  Musket argues that the "more appropriate" provision for the situation here is found in § F-1 of the Master Agreement, which requires that notice of disputes about invoices be commenced within 24 months following the month to which the invoice relates.  *Id.* (citing Dkt. 88, Ex. C-1).  Finally, Musket contends that even if § S applies, Suncor cannot assert the claim because it did not plead failure to provide notice as a condition precedent and, regardless, Musket's communications to Suncor provided sufficient notice.  *Id.*  Musket notes that it provided daily updates on the volume of crude oil delivered and monthly invoices showing the volume delivered.  *Id.*

Suncor replies that it specifically pled that Musket's claim was barred because Musket failed to comply with contractual notice provisions and that § S, not § F-1, applies to notice of deficiencies.  Dkt. 90.  As far as Musket's evidence that it provided notice, Suncor argues that the evidence provided by Musket does not constitute notice as contemplated by § S.  *Id.*

### 1.    Pleading

First, the court finds that Suncor adequately pled that Musket failed to provide sufficient notice.  *See* Dkt. 12 (Answer) ¶ 33 ("Plaintiff's claims are barred by failure to comply with contractual notice provisions."); Dkt. 37 (answer to amended complaint) ¶ 42 ("Plaintiff's claims

are barred in whole or in part by the notice provision in Section S. Exclusions and Limitations of the Master Agreement."). Musket contends that Suncor did not plead the defense as a *condition precedent* and did not identify it as a condition precedent in its interrogatory answers. Dkt. 88. While Suncor did not mention the words "condition precedent" when pleading that Musket's claims were barred by failing to give notice, the defense was pled with sufficient particularity to give Musket notice of the defense.

### 2.    Evidence

The court has reviewed the evidence Musket presents as showing that it provided notice. Musket first provides the declaration of its managing director and vice president, who states:

> Musket provided full notice to Suncor of any quantity deficiencies through daily updates on the volume of crude oil delivered as noted in, for example, Exhibits C-16, C-17, C-18, and C-19. At the end of the month, Musket provided a monthly total as noted in, for example, Exhibits C-14, C-15, C-20, C-21, C-22, and C-23. Suncor also sent an Invoice each month showing the volume delivered to the Windsor Terminal for the prior month (*see* Exh. C-12). Suncor was required to deliver a certain volume of crude oil and Musket regularly communicated that Suncor failed to deliver its contractually-agreed volume. As such, Musket made Suncor aware it was not complying with the Master Agreement and Confirmation and that this would cause Musket to suffer damages.

Dkt. 88, Ex. C ¶ 23. Exhibits C-16 through C-19 are monthly reports from September through December 2014 that show how many barrels per day Suncor delivered to Musket for those months. Dkt. 88, Exs. C-16, C-17, C-18, C-19. Exhibits C-14 and C-15 are the same type of reports, but they are for January through March of 2015. Dkt. 88, Exs. C-14, C-15. Exhibits C-20, C-21, C-22, and C-23 cover April 2014, June 2014, July 2014, and August 2014. Dkt. 88, Exs. C-20, C-21, C-22, C-23. All of these reports are attached to emails that were sent to Suncor employees. Many of the

emails discuss delivery issues.  For example, in August 2014, a Musket employee corresponded with various Suncor employees about how Musket was "hurting for barrels" and how Suncor was "hunting around for some extra trucks to send [Musket]."  Dkt. 88, Ex. C-21.  In November 2014, Musket asked how deliveries were looking for the last week of the month and asked if Suncor had "any extra barrels to swing [Musket's] way or [could] buy some off the refinery."  Dkt. 88, Ex. C-17.  In March 2015, Musket's scheduler stated that "Windsor has plenty of capacity" and that it could "not afford to have no deliveries for two days in a row."  Dkt. 88, Ex. C-14.  He asked Suncor to "please send some [crude oil its] way today."  *Id.*

This evidence indicates that Musket kept Suncor informed as to how many barrels were delivered, and clearly Suncor could have calculated the deficiencies by looking up how many barrels it was supposed to deliver under the contract and subtracting the amount actually delivered.  However, notice of barrels delivered is not the same as notice of deficiencies, and § S requires a formal notice of deficiencies.  Thus, to the extent Musket was required to comply with § S on the dates listed, it has not provided evidence that there is an issue of material fact that it formally notified Suncor of the *deficiencies* for those months.

### 3.    Applicability of § S

The court now turns to whether § S applies.  First, the court finds Musket's argument that § F-1, rather than § S, should apply unpersuasive.  Section F-1 is entitled "payment."  *See* Dkt. 73, Ex. A § F-1 (Suncor000493).  It discusses the procedure for invoicing and paying.  *See id.*  It notes that the parties have the right to have an auditor verify the accuracy of invoices so long as the party does so within twenty-four months of the month invoiced.  *Id.*  While this auditor would certainly consider the quantities discussed in any notices when determining whether the invoice is correct, this

section does not deal with the procedure for notice.  Section S clearly addresses notice.  *See* Dkt. 73, Ex. A § S ("Any claim against the Seller . . . must be made by written *notice* delivered to the Seller within sixty (60) days of the date of delivery . . . .").

Second, the court is also not persuaded by Musket's argument that the alternatives contained in the Physical Transaction Confirmation provided the procedure to be used if Suncor did not deliver the full Committed Volume and that the notice provision of § S therefore does not apply.  It seems, for instance, that these alternatives would still require a notice of deficiency to calculate the $2.50 per barrel associated with the Committed Volume that must be paid under Alternative #2.

Musket has not shown that the notice requirement in § S is in conflict with the provisions in the Physical Transaction Confirmation.  The court therefore reads the contract as a whole and finds that the notice provision of § S was still applicable notwithstanding the additional procedures outlined in the Physical Transaction Confirmation.  Section S clearly contemplates formal notice, and Musket has provided no evidence indicating that there is an issue of material fact that it supplied a formal notice of deficiencies before August 1, 2014, and between February 1, 2015 and March 31, 2015.  Suncor's motion for summary judgment as to deficiencies for these months is therefore GRANTED.

**E.    Attorneys' Fees**

Musket requests reasonable attorneys' fees in its second amended complaint.  Dkt. 25. Suncor seeks summary judgment on Musket's attorney fee request, asserting that Musket cannot recover attorneys' fees because, under New York law, attorneys' fees may be recovered only if the contract expressly permits recovery of attorneys' fees, and the Agreement does not address attorneys' fees.  Dkt. 73.  Musket agrees that the general rule in New York is that the prevailing party may not

recover attorneys' fees, but it argues that there is an exception if "the defendant, 'with actual malice, intentionally seeks to inflict economic injury on plaintiff by forcing him to engage legal counsel.'" Dkt. 88 (quoting *Versatile Housewares & Gardening Sys., Inc. v. Thill Logistics, Inc.*, 819 F. Supp. 2d 230, 241 (S.D.N.Y. 2011)).  Musket asks the court to reserve ruling on this issue until trial, where it contends that it will present evidence of malice.  *Id.*  Suncor points out that Musket did not plead malice and has offered no evidence of malice.  Dkt. 90.  The court agrees with Suncor.  Musket's burden at the summary judgment stage is to come forward with some evidence that there is an issue of material fact, and it has failed to do so with regard to malice.  Suncor's motion for summary judgment on its claim for attorneys' fees is GRANTED.

### IV. CONCLUSION

Suncor's motion for summary judgment is GRANTED IN PART AND DENIED IN PART. Is it DENIED with respect to Musket's claim that Suncor failed to comply with the Agreement's confidentiality provision.  It is otherwise GRANTED.  Musket's claims that Suncor breached the Agreement by failing to deliver crude oil and failing to comply with the compensation provisions are DISMISSED WITH PREJUDICE.

Signed at Houston, Texas on February 15, 2017.

_____
Gray H. Miller
United States District Judge