United States District Court
Southern District of Texas
**ENTERED**
March 07, 2017
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| MUSKET CORPORATION, § | |
| § | |
| *Plaintiff,* § | |
| § | |
| v. § | CIVIL ACTION H-15-100 |
| § | |
| SUNCOR ENERGY (U.S.A.) MARKETING, INC., § | |
| § | |
| *Defendant.* § | |

**MEMORANDUM OPINION AND ORDER**

On January 18, 2017, the court entered a memorandum opinion and order in which the court ordered defendant Suncor Energy (U.S.A.) Marketing, Inc. ("Suncor") to file a surreply addressing whether it had evidence that Musket Corporation ("Musket") failed to use commercially reasonable efforts to ensure that its Windsor Terminal had sufficient capacity. Dkt. 113. The court deferred ruling on a portion of Musket's motion for summary judgment until this issue could be resolved. *See* Dkt. 113. Suncor complied with this request on February 2, 2017. Dkt. 114. Musket filed a letter on February 13, 2017, which the court has deemed a surreply. Dkts. 115, 117. The court held a hearing on this issue on Wednesday, February 22, 2017. After considering the briefing, arguments at hearing, record evidence, and the applicable law, the court finds that Musket's motion for summary judgment on paragraph (iii) of the Physical Transaction Confirmation should be GRANTED.

**I. BACKGROUND**

This is a breach of contract case, and the portion of the motion for summary judgment currently under consideration relates to, specifically, paragraph (iii) of the Physical Transaction Confirmation, which is part of an agreement for the purchase of crude oil by rail entered into by Musket and Suncor on April 1, 2013. Dkt. 73, Ex. A. The Physical Transaction Confirmation sets forth the "general commercial terms" of the agreement, including the specific product, quality, term

of the agreement, and quantity. *Id.* The quantity was scheduled to increase periodically because Musket was planning to expand its Windsor Terminal, which is where it was accepting deliveries of the crude oil from Suncor. *Id.*

Immediately after setting forth the general terms, the Physical Transaction Confirmation states that if Musket did not expand the terminal capacity as expected "for whatever reason," Suncor could terminate the agreement. *Id.* The document then gives exact details regarding the delivery point and the way the parties were required to negotiate the price, provides alternatives should the parties not be able to agree on a price or identify a profitable market after exhausting reasonable efforts, sets forth the payment terms, and lists "additional provisions," which are primarily where the instant dispute lies. *Id.* The first portion of the additional provisions relates to Suncor being the exclusive supplier of crude oil to the Windsor Terminal. *Id.* Paragraph (ii), which the court dealt with in its previous order, provides remedies if Musket failed to provide rail cars. *Id.* Paragraph (iii), which is at issue here, requires that Musket "[u]se any and all reasonable commercial efforts to ensure that the Windsor Terminal has sufficient capacity to receive Product delivered by [Suncor] at all times throughout the Term." *Id.* The Physical Transaction Confirmation then states that Suncor may, without limiting its other rights and remedies, terminate the Transaction without penalty if the Windsor Terminal cannot receive the crude oil due to a lack of capacity and the inability affects Suncor's ability to deliver for three consecutive months. *Id.*

In Musket's original motion for summary judgment on Suncor's counterclaim, Musket moved for judgment on Suncor's "sole counterclaim," which it believed was asserted under paragraph (ii) of the Physical Transaction Confirmation. Dkt. 72. In the motion, Musket stated, "'Despite this broad rhetoric [in Suncor's counterclaim], Suncor's counterclaim to affirmative relief is narrow: Suncor alleges that it is entitled to liquidated damages in the amount of $1.50 per barrel

of crude that it committed to deliver to the Windsor terminal . . . ." *Id.* (citing Dkt. 12 (counterclaim) ¶ 53 n.1). Musket agreed in the motion that Suncor alleged its damages in general terms in its counterclaim but that its corporate representative testified that the damages sought are those available for breach of paragraph (ii) of the Physical Transaction Confirmation. *Id.*

In its response to the motion for summary judgment, Suncor stated that Musket "focused solely on the claim that Musket breached the parties' contract by failing to provide sufficient railcars," which is the claim under paragraph (ii), and that Musket had "not moved for summary judgment on Suncor's claim that the Windsor Terminal . . . did not have sufficient capacity to receive the crude oil volumes contemplated by the contract." Dkt. 79. Suncor continued, "Musket moved for summary judgment on only one basis for Suncor's breach of contract counterclaim—Musket's failure to supply sufficient railcars in breach of Paragraph (ii) of the Additional Provisions of the contract. This is **not** the sole basis for Suncor's counterclaim. . . . Musket has failed to challenge Suncor's counterclaim for breach of the Agreement based on Paragraph (iii) of the Additional Provisions and Musket's liability under § S. These provisions deal with Musket's obligation to purchase the crude oil sold by Suncor and to make the Windsor Terminal capable of ratably receiving the agreed-upon volumes of crude oil, independent from Musket's obligation to provide sufficient rail cars." *Id.* Thus, in the response, Suncor focused on breaches of paragraph (ii) *and* (iii) and damages available for the alleged breach of paragraph (iii) under § S. Importantly, it did not allege or present arguments related to a broader breach of the general terms of the contract not related to paragraphs (ii) or (iii).

In its reply, Musket argued that Suncor did not plead a breach of paragraph (iii) or § S damages. Dkt. 80. It also argued that even if Suncor had pled a breach of paragraph (iii), Suncor

had no evidence that Musket failed to use "reasonable commercial efforts" as required by paragraph (iii).

On January 18, 2017, the court issued an order on Musket's motion for summary judgment. Dkt. 113. It granted summary judgment to the extent the counterclaim was for breach of paragraph (ii), and it requested further briefing (a surreply) from Suncor regarding whether it had evidence that Musket had failed to use reasonable commercial efforts under paragraph (iii). *Id.*

Suncor filed a surreply as requested. Dkt. 114. In the surreply, Suncor argues that its counterclaim "is not limited by Musket's breach of the 'reasonable commercial efforts' clause" because the agreement "expressly required Musket to (1) purchase and receive crude oil in the Committed Volume amounts and (2) expand the Windsor Terminal and construct additional infrastructure to be able to receive the Committed Volumes." *Id.* It cites to pages Suncor000487, 501, and 502 of the Physical Transaction Confirmation as support for this assertion, and argues that Musket breached these obligations, entitling Suncor to damages under § S of the master agreement. *Id.* Suncor argues that this breach is "*in addition to* Musket's breach of the 'reasonable commercial efforts' clause" and that the "'reasonable commercial efforts' clause does not modify or negate Musket's other contractual obligations." *Id.* This is a *new* argument not discussed in Suncor's response to Musket's motion for summary judgment.

Suncor also argues that (1) "reasonable commercial efforts" is the same as "best efforts" under New York law; and (2) the agreement itself sets forth the criteria for "reasonable commercial efforts" by providing specific examples of the types of efforts that are required to ensure sufficient capacity—providing rail cars, constructing additional infrastructure, and having onsite storage tanks and loading equipment. *Id.* Suncor argues that the evidence it submitted showing that Musket failed to ensure sufficient capacity to meet contractual obligations is all the evidence needed to show that

Musket did not exercise reasonable commercial efforts. *Id.* It also submits an additional declaration regarding the intent of the parties when including the reasonable commercial efforts clause. *Id.* & Ex. A.

Musket provided a letter brief, which the court is treating as a reply to Suncor's surreply, in which Musket argues that the standard imposed by a "reasonable commercial efforts clause" under New York law is less stringent than a "best efforts" clause, and that Suncor's argument that Musket's inability to accept the crude oil volumes listed in the contract is sufficient evidence of its failure to use reasonable commercial efforts reads the term "reasonable commercial efforts" out of the contract. Dkt. 115.

The court held a hearing on February 22, 2017, and the parties presented arguments on these issues. In this memorandum opinion and order, the court will first set forth the legal standard for summary judgment. Then, it will address whether Suncor has asserted a claim broader than the claims under paragraphs (ii) and (iii) and whether Suncor has presented enough evidence of an issue of material fact with regard to paragraph (iii) to survive summary judgment.

## II. LEGAL STANDARD

A court shall grant summary judgment when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[A] fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party." *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). If the party meets its burden, the burden shifts to the non-moving party to set forth specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e). The court must view the evidence in the light most favorable to the

non-movant and draw all justifiable inferences in favor of the non-movant. *Envtl. Conservation Org. v. City of Dall., Tex.*, 529 F.3d 519, 524 (5th Cir. 2008).

### III. ANALYSIS

**A.      What Obligation Does Suncor Actually Allege Musket Breached?**

Suncor asserts a counterclaim for "breach of contract." Dkt. 12 at 9. In its counterclaim, Suncor broadly states that "Musket materially breached its contracts with Suncor by failing to comply with its terms and failing to purchase or receive the contractually-agreed crude oil volumes from Suncor. . . . Musket's breach of contract has caused Suncor to suffer actual damages." *Id*. In the court's original order on Musket's motion for summary judgment, it found that this language was broad enough to encompass Suncor's claim that it was also asserting that Musket breached paragraph (iii). *See* Dkt. 113. Suncor now asserts that the counterclaim extends even further and covers the general provisions in the contract that set forth Musket's intention to expand the Windsor Terminal and purchase and receive crude oil in the committed volumes. *See* Dkt. 114.

The broad language in the counterclaim supports this expanded claim. In the factual background of the counterclaim, Suncor details how Musket failed to purchase the committed volumes under the agreement. Dkt. 12 at 7. Paragraph 52 states that Suncor was willing and able to deliver but that the Windsor Terminal was not capable of accepting the committed volume and that Suncor believed the inability to accept the committed volume was due to Musket's failure to invest money and resources into the terminal. *Id.* Paragraph 53 reiterates that the terminal could not consistently accept the committed volume, and paragraph 54 states that Musket often turned away Suncor trucks causing Suncor significant damages. *Id.* The footnote to paragraph 53 sets forth the damages for breach of paragraph (ii). This is the only specificity in the counterclaim about damages. *See id.*

6

While the broad counterclaim could support Suncor's new generalized claim for breach, the court finds that the contract itself does not. Suncor cites specifically to pages Suncor000487, 501, and 502 of the Physical Transaction Confirmation to support its generalized claim to damages under § S. Page 487 states that "Seller shall deliver, and Buyer shall purchase and receive crude oil . . . as specified in the Confirmation and otherwise on the terms and conditions set forth in this Agreement." Dkt. 73, Ex. A at Suncor000487. Page 501 is the first page of the Physical Transaction Confirmation, which sets forth the committed volumes. *Id.* at Suncor000501. It also states that the "Parties acknowledge and understand that the Windsor Terminal capacity is anticipated to increase during the Term as additional infrastructures [are] completed" and that the committed volumes will increase accordingly, as set forth in the table. *Id.* Page 502 addresses what would happen if Musket did not get the permits to expand and gives Suncor the right to terminate the agreement if the terminal was not expanded to meet the capacity set forth in the table. *Id.* at Suncor000502. These pages provide the remedy if Musket does not expand enough "for whatever reason"—Suncor can terminate the transaction. *Id.* They do not point to § S or any other provision of the agreement.

Paragraph (iii) of the additional provisions requires Musket to use reasonable commercial efforts to expand the terminal. *Id.* at Suncor000504. Suncor argued in its original response to Musket's motion for summary judgment that § S damages apply to breach of paragraph (iii). Dkt. 79. Suncor essentially asks the court to disregard paragraph (iii) and go to § S damages for breach of the requirement to expand the terminal sufficiently to accept the committed volumes on pages 501–502. But pages 501 and 502 cannot be read independently of paragraph (iii). While there would have been no requirement for use of reasonable commercial efforts if Suncor had desired to simply terminate the agreement for failure to expand the volume capacity "for whatever reason" as set forth on page 502, the contract does not provide for actual damages for the failure to expand

7

unless there is also a breach of paragraph (ii) or (iii). And Musket did not breach paragraph (iii) unless it failed to use reasonable commercial efforts to expand the terminal.

Suncor must present an issue of material fact that there was a failure to use reasonable commercial efforts in order to survive summary judgment. Thus, to the extent Suncor asserts that it is entitled to § S damages because Musket breached its obligations on pages 487, 501, and 502, independently of its obligation under paragraphs (ii) and (iii), that claim is DISMISSED because the agreement itself does not support such a claim. The court will therefore only address the counterclaim to the extent Suncor asserts that Musket breached paragraph (iii).

**B.      Is There an Issue of Material Fact with Regard to Paragraph (iii)?**

Suncor argues that "reasonable commercial efforts" is the same as "best efforts" under New York law and that the agreement itself sets forth the requirements for best efforts, which were not met because Musket could not consistently take the committed volumes. Dkt. 114. Musket contends that "reasonable commercial efforts" is less stringent than "best efforts" under New York law and that Suncor must have an expert to discuss what efforts would have been reasonable in this case. Dkt. 115.

Suncor relies first on *Monex Financial Services, Ltd. v. Planet Payment, Inc.*, 657 F. Supp. 2d 447, 454 (S.D.N.Y. 2009). The court in *Monex*, which was considering a contract under Florida law, noted that there were no Florida cases interpreting a "reasonable efforts" clause and that "'New York courts use the term "reasonable efforts" interchangeably with "best efforts."'" 657 F. Supp. 2d at 454 (quoting *Scott-Macon Sec., Inc. v. Zoltek Co.*, No. 04 Civ. 2124 (MBM), 2005 WL 1138476 (S.D.N.Y. May 12, 2005)). It noted, however, that "New York courts have explained that 'a "best efforts" clause imposes an obligation to act with good faith in light of one's own capabilities.'" *Id.* (quoting *Bloor v. Falstaff Brewing Corp.*, 601 F. Supp. 2d 609, 613 (2d Cir.

8

1979)). The *Monex* court did not address whether a "reasonable *commercial* efforts" clause is used interchangeably with "best efforts" or what the requirements would be for such a clause.

Suncor next discusses *USAirways Group v. British Airways PLC*, 989 F. Supp. 482, 491 (S.D.N.Y. 1997). The court, which was considering a motion to dismiss because the "best efforts" provision in a contract was unenforceable, noted that "[u]nder New York law, a contract need not explicitly define 'best efforts' for its 'best efforts' provision to be enforceable." The court instructed that to the extent the agreement is ambiguous and the "criteria by which to measure the parties' 'best efforts' are lacking," "the extrinsic circumstances concerning the parties' understanding of that term may be considered by the finder of fact." 989 F. Supp. at 491. The relevant clause at issue in *USAirways Group* required the parties "to use their 'best efforts' to obtain Department of Transportation ('DoT') approval of all transactions as promptly as practicable." *Id.* at 490. British Airways argued that the best efforts clause was uneforceable because the agreement did not contain objective criteria by which to measure performance, and USAirways argued that the facts surrounding the agreement gave meaning to the best efforts provision. *Id.* at 491. The court noted that a contract need not define "best efforts" for the provision to be enforceable and that extrinsic evidence may be considered if the agreement is ambiguous as to what "best efforts" means. *Id.* (citing *Bloor*, 454 F. Supp. at 266–67 and *McDarren v. Marvel Entm't Grp., Inc.*, No. 94 CIV. 0910 (LMM), 1995 WL 214482, at *4-5 (S.D.N.Y. Apr. 11, 1995)).

Next, Suncor points to *Vestron, Inc. v. National Geographic Society*, 750 F. Supp. 586, 593 (S.D.N.Y. 1990), as indicating that a best efforts clause must be read in the context of the entire agreement and not used as a basis for negating other contract provisions. In *Vestron*, National Geographic granted a license to the plaintiff, a video production company, for home video rights to National Geographic documentaries. 750 F. Supp. at 587. National Geographic contended that the

9

plaintiff did not exercise best efforts when it entered into subdistribution agreements. *Id.* at 593. The court found, however, that the contract permitted the plaintiff to enter into the subdistribution agreements and that it appeared that the plaintiff was making reasonable marketing decisions. *Id.* National Geographic argued that the best efforts clause trumped the clause permitting subdistribution, but the court found that a "best efforts requirement must be reconciled with other clauses in the contract to the extent possible, not used as a basis for negating them." *Id.* (citing *Bloor*, 454 F. Supp. at 266).

Suncor also relies on *Board of Managers of Chocolate Factory Condominium ex. rel. Chocolate Factory Condominium v. Chocolate Partners, LLC*, 992 N.Y.S.2d 157 (Table), 2014 WL 1910237, at *1 (N.Y. App. Div. May 13, 2014), an unreported decision of the New York Supreme Court, Kings County. The Board of Managers moved to dismiss the complaint, arguing that another New York court had dismissed a case with a best efforts clause because the contract did not set forth clear guidelines to measure best efforts. 2014 WL 1910237, at *6 (citing *Strauss Paper Co. v. RSA Exec. Search*, 688 N.Y.S.2d 641 (N.Y. App. Div. 2002)). The *Chocolate* court noted that a "'best efforts' provision may be enforced even in the absence of contractually articulated criteria" if "the contractual language and circumstances permit an inference as to the applicable criteria for performance." *Id.* The court cited numerous New York cases that had enforced best efforts clauses without articulated objective criteria. *Id.* (collecting cases).

The court finds the first case cited by the court in *Chocolate* to be more instructive than any of the cases cited (above-the-line) by Suncor. The court in *Ashokan Water Services, Inc. v. New Start*, 807 N.Y.S.2d 550, 555 (N.Y. Civ. Ct. 2006), noted that "the cases have not clearly articulated how a 'best efforts' obligation alters or supplements the promisor's overall standard of performance, and the verbal formulae that courts use when applying a 'best efforts' obligation often confuse rather

than clarify." 807 N.Y.S.2d at 555. It went on to explain that best efforts obviously requires more than good faith, which is implied in all contracts anyway, and that the formulae courts have used include due diligence, all reasonable efforts, reasonable efforts, good faith business judgment, genuine effort, and active exploitation in good faith. *Id.* (collecting cases). It then cites Judge Friendly in *Bloor*, who found that the cases suggest that a best efforts clause "'imposes an obligation to act with good faith in light of one's own capabilities.'" *Id.* (quoting *Bloor*, 601 F.2d at 613).

In the instant case, if the court were to consider if Musket acted in good faith in light of its own capabilities, it would need to know what types of capabilities a company that is expanding a rail terminal to accept crude oil in Colorado should have. The determination of what those capabilities are necessarily requires an expert or at least some evidence that would suggest to the finder of fact that the company was not doing what a reasonable company facing the same obstacles would do to expand the terminal. The evidence provided by Suncor to demonstrate an issue of material fact shows that the terminal was not expanded in the way expected when the parties agreed to the committed volumes. *See* Dkt. 114 (laundry list of evidence). While Suncor argues that what is reasonable is spelled out in the contract because it requires expanding committed volumes and requires Musket to have sufficient rail cars and expand the terminal, the court finds that if this is what it means to act in a commercially reasonable way, the addition of the phrase "commercially reasonable efforts" would have been superfluous. In other words, if the parties contemplated that it was patently unreasonable to not expand the terminal enough to accept the committed volumes, there would have been no need to add the reasonable commercial efforts provision. Under New York law, a reading of a contract that renders any provision superfluous is disfavored. *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002).

The cases relied upon by Musket, which actually relate to "reasonable efforts" or "reasonable commercial efforts," highlight this point. In *In re Chateaugay Corp.*, 198 B.R. 848 (S.D.N.Y. 1996), the court noted that "a party is entitled to give 'reasonable consideration to its own interests' in determining an appropriate course of action to reach the desired result" when faced with a best efforts clause, which it noted is more stringent than a reasonable efforts clause. 198 B.R. at 854. It found that a "party may thus exercise discretion, within its good faith business judgment, in devising a strategy for achieving its ultimate goal." *Id.* at 855. The court instructed that "in order to prevail upon its allegations that [the alleged breaching party] did not exert reasonable efforts to consummate the transaction, [the party alleging breach] must demonstrate that [the alleged breacher's] actions were inconsistent with good faith business judgments." *Id.* In a case such as the instant case, involving an industry with which the ordinary trier of fact will be unfamiliar, it is almost imperative to have an expert to testify as to whether the business judgments of the alleged breaching party were good faith business judgments.

Musket also relies on *Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc.*, No. 03 Civ. 8259 (CSH), 2007 WL 1988150, at *22–23 (S.D.N.Y. July 10, 2007). The *Bear* court considered a motion for summary judgment on a breach of contract claim on a loan agreement that required the lender to "'use commercially reasonable efforts to achieve a Securitization which results in the lowest Spread possible which does not compromise Lender's right to securitize the Loan.'" 2007 WL 1988150, at *3 (quoting the contract). The court noted that the majority of arguments that there was an issue of material fact as to "commercially reasonable efforts" relied on hindsight and intruded too much on the business judgment of the party required to use commercially reasonable efforts. *Id.* at *22. The court ultimately found, however, that there was sufficient evidence that one particular business decision was based on spite rather than good faith business judgment, which

12

precluded summary judgment. *Id.* at *23. In the instant case, there is no evidence that Musket made any business decisions in bad faith. And Suncor has presented no evidence aside from the fact that the terminal could not meet the committed volume to indicate that Musket did not use good business judgment.

Musket also relies on *Sekisui America Corp. v. Hart*, 15 F. Supp. 3d 359, 381 (S.D.N.Y. 2014). *Sekisui* was a breach of contract case in which the court held a bench trial. The relevant clause at issue required Sekisui to use "commercially reasonable efforts" to market a drug and take action to obtain FDA approval of the drug. 15 F. Supp. 3d at 362. The court held that the Harts did not prove that Sekisui breached this term because they provided "no evidence establishing the objective standard for 'commercially reasonable efforts' in the FDA-regulatory context" and did not explain how Sekisui "deviated from that standard." While the commercially reasonable efforts required to expand a rail terminal in the instant case are perhaps not as complex as those required to obtain FDA approval of a drug in *Sekisui*, they are also not something about which the ordinary finder of fact would be sufficiently familiar to draw conclusions from the evidence.

These cases make clear that Suncor does not have sufficient evidence of whether Musket used commercially reasonable efforts to create an issue of material fact for trial.

### IV. CONCLUSION

Musket's motion for summary judgment on Suncor's counterclaim that Musket breached paragraph (iii) of the Physical Transaction Confirmation is GRANTED. Suncor's counterclaim is DISMISSED WITH PREJUDICE.

Signed at Houston, Texas on March 7, 2017.

_____
Gray H. Miller
United States District Judge